UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | 18-mj-00784-N/A-LCK |
| | ) | |
| vs. | ) | |
| | ) | Tucson, Arizona |
| Ahmad Suhad Ahmad, | ) | November 2, 2018 |
| | ) | 10:32 a.m. |
| Defendant. | ) | |

TRANSCRIPT OF PROCEEDINGS
INITIAL APPEARANCE ON AMENDED COMPLAINT/
DETENTION HEARING

BEFORE THE HONORABLE ERIC J. MARKOVICH
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:
Kevin Hakala
U.S. Attorney's Office
405 West Congress Street, Suite 4800
Tucson, AZ 85701

For the Defendant:
Walter Goncalves, Jr.
Federal Public Defender's Office
407 West Congress Street, Suite 501
Tucson, AZ 85701

Transcribed by:
Cindy J. Shearman
405 West Congress Street, Suite 1500
Tucson, AZ 85701
520-205-4286

Proceedings were digitally recorded
Transcript prepared by transcriptionist

P R O C E E D I N G S

(Call to order of court, 10:32 a.m.)

(Matters not pertaining to AHMAD SUHAD AHMAD were not transcribed.)

CLERK: 18-mj-184, Ahmad Suhad Ahmad on for initial appearance and status conference.

Would counsel please state your appearances?

MR. HAKALA: Good morning, Your Honor. Kevin Hakala for the United States.

THE COURT: Good morning.

MR. GONCALVES: Good morning, Judge. Walter Goncalves for Mr. Ahmad who is present to my right. Also present at the gallery to my left we have his mother, we have his sister, and we have a friend of the family.

THE COURT: Okay. Good morning to everybody.

So, Mr. Goncalves, have you gone over the amended complaint with -- it adds a drug felony charge for Mr. Ahmad, you've gone over that with him?

MR. GONCALVES: Yes, I have, Your Honor

THE COURT: Okay. And then, Mr. Ahmad, so you have the same rights that I've advised you of.

You have the right to have an attorney represent you at no cost to you.

You have a right to remain silent and not say anything about the charges other than to your attorney.

You have the right to be released from custody pending your trial. We're going to talk about that now. I had -- I had asked, although you weren't present at the initial appearance, Mr. Goncalves, the government is requesting a dangerousness hearing. I have about six possible dates in front of me that I could let you all know when we can do that hearing.

MR. HAKALA: And, Your Honor, we are certainly prepared to go to schedule a dangerousness hearing although, in light of the additional charge that has been added which makes this a presumption case, we're also prepared to present argument for detention today if the court would prefer.

THE COURT: On the issue of dangerousness?

MR. HAKALA: It would encompass that, it's not just dangerousness but, I mean, there is also a risk of flight as discussed by pretrial services but the primary basis for the argument is the danger to community but that's not the only basis for detention.

THE COURT: Well, I think I'd like to have a hearing with some testimony.

Mr. Goncalves, what are your thoughts?

MR. GONCALVES: Well, Your Honor, here's where I am with this. There was an initial appearance on Monday. The government, as you know, is entitled to, I believe, a three-day continuance. I asked for a continuance of five business days, which is what the statute allows me to do. And so I believe

today is the fifth business day so I would object to the court setting any other hearing.

I spoke with Mr. Hakala on email yesterday and asked him if he was going to call any witnesses this morning on the issue of detention and I was told that, no, and that's correct, there's nobody here. And it's my understanding that they are prepared to argue release or -- and their position of detention this morning. So I believe we can have the hearing this morning and have the court make a decision.

THE COURT: Okay. Well, that's fine. Let's hear what you've got to say then.

Mr. Hakala?

MR. HAKALA: Thank you, Your Honor. First, Your Honor, I'd like to start by going over the pretrial services report and then I'll go over the major -- the current charges.

So first of all, we do agree with the recommendation of pretrial services and they do recommend detention in this case. The first thing that I would focus on the report is his criminal history. They note that the defendant, he does have a prior drug felony from November of 2016. While he was on probation for this drug felony, he committed the June 2017 drug trafficking offense and for that he was sentenced to two years in prison. The -- the pending charges, as well, were committed while he was on probation.

Pretrial services notes that he has extensive foreign

familial ties. They note that he provided a false report to the department of corrections with regards to the address where he would be residing. And they also note a history of substance abuse which he reports that his current sobriety coincides with the time of his arrest in June of 2017. He admitted to prior use of methamphetamine, cocaine, and marijuana. And he told pretrial services that he is in the process of applying for a medical marijuana card.

It was ultimately their recommendation, based on the nature of the alleged charges, his criminal history, which includes the felony probation revocation, that he does pose a danger to the community and that there is no condition or combination of conditions to reasonably assure his appearance in court, and we certainly agree with that.

I don't think that -- in this case, because there is a presumption of detention for what is a very serious drug charge, not to mention the very serious 842 charge, that we don't need to have a dangerousness hearing. And I will kind of go over some of the more egregious factors of the current charges which are pending.

Again, as I said, there is a presumption of detention. The defendant -- the evidence we have, the defendant conspired to possess with the intent to distribute about 150 grams of heroin. Given his criminal history, he is not Safety Valve eligible, so he's looking at a five- to 40-year sentence for

the drugs alone. And he is facing the mandatory minimum of five years just for the heroin charge.

With regards to the drug trafficking charge, the evidence in this case involves Ahmad, the defendant, contacting his own sources of heroin supply and selling in February of 2017 what he believed to be about 50 grams of heroin. It turns out that there was a 45.3 grams but that transaction did go through. And, again, this was heroin that the defendant obtained from his own source of supply.

In March of 2017, he made arrangements to sell another 100 grams of heroin, although the day that that was -- that that transaction was scheduled to take place, the defendant's source of supply, according to the defendant, had sold all of his remaining heroin that day so that transaction was not completed.

In addition to the heroin charge, there is the very serious charge involving the distribution of information relating to explosives and destructive devices, the 842 charge. There's evidence that back in December of 2016 the defendant was bragging to confidential sources about his knowledge about how to detonate explosive devices by using a cellular phone. He explained how he'd learned this information while living in Iraq and he said that how the bombs were easy for him to make.

Over the course of the next several months, the defendant had numerous conversations with confidential sources about how

to make various types of bombs. He bragged and talked about making bombs using glass bottles, bombs using buckets that could be filled with nails, screws, and ball bearings. He talked about devices that can be detonated remotely with devices such as cell phones.

Now, the defendant believed that the CSs worked for a Mexican drug trafficking organization and in April of 2017 when the sources met with the defendant in Tucson to discuss the defendant building one of his devices to take out a higher up within the drug trafficking organization.

The defendant was very willing to build such a device. He offered his services for free and for payment and ultimately it was agreed upon that he would build the device in Las Vegas that would be used against the member of the drug trafficking organization when he was in the United States.

Throughout the course of the planning, the defendant provided multiple recipes to the source on how to actually make an explosive and the FBI followed the steps of one of the recipes and did confirm that it actually did create a working explosive.

When they traveled to Vegas, the defendant brought a number of his own supplies and had provided the information to the sources and the undercover agents about additional supplies that would be needed and, over the course of several hours, he built a -- a triggering mechanism that was capable of remotely

detonating an explosive device that he believed was going to be used to kill an individual who was in the United States.

And it's also, I think, of note that throughout the course of the investigation, the defendant made numerous threats against the source, that if he or his family were somehow -- something were to happen to him, that he would blow up the source and his family.

So I think that just the nature of his behavior is so clearly a danger to the community and given the seriousness of the drug trafficking misconduct and obviously the fact that this is a presumption case, that there is no circumstances that would make his release -- that would mitigate the danger that he poses. And I will also add that we anticipate an indictment and additional charges will be added.

THE COURT: Let me ask you, so the offenses are kind of historical in the sense that the drug and the bomb offense -- bomb-related type offense, they span from January '17 to April of 2017. I take it Mr. Ahmad was in -- it looks like he was in -- in state court custody until September 28th of this year. Is that why the charges weren't --

MR. HAKALA: That's correct.

THE COURT: It's kind of odd that our use of danger if you've let him out on the streets for a couple of years.

MR. HAKALA: So he was originally picked up, I believe, in June of 2017 and the investigation at that time was

very active and he was being very closely monitored and then once he was picked up on the state charges and ultimately sentenced, then the decision was made to hold off until now to bring the charges.

THE COURT: Okay. Thank you.

Mr. Goncalves?

MR. GONCALVES: Thank you, Judge. Well, number one, the court is required to address all the factors in 18 USC 1342(g). The first one, as the court knows, is the nature and circumstances of the offense, whether it's a crime of violence, a federal crime of terrorism, et cetera, et cetera. You know, Judge, that this is a crime involving an explosive device. Obviously I think the allegation in and of itself is serious -- we acknowledge that -- and another charge involving a relatively small amount of heroin by what the court sees, I think, every day in this district.

So the number two, though, the court has to decide or weigh the evidence against the person. However, this particular factor, at this stage, Your Honor, is the -- is the factor that the court has to place the least amount of weight to. In other words, because we're at the early phase of the proceedings, the defense has been provided virtually no evidence and only a complaint. And so I'm not prepared to address all of the additional facts that we have heard this morning from the government.

Some of these facts or a lot of them are not mentioned in the complaint and I'm just not prepared to really get into that into any detail about it because I haven't had a chance to talk to my client about it.

THE COURT: Well, that's exactly why I asked you if you wanted a hearing.

MR. GONCALVES: Well, but the purpose of this particular hearing, Judge, is that the government is -- well, let me put it this way: The government had five business days to bring witnesses in. And by statute I'm entitled to five days' continuance and that's what I had and that's what I asked for. The government could have certainly brought these witnesses here. So -- but nonetheless, this -- this is the factor that the court is not -- is to give the least weight of evidence to.

So, at this point, I can't address whether the device that he allegedly built worked, I can't address whether it was tested, I can't address as to whether he really knew what he was doing or not. We're not here for a trial. This is not a trial on the evidence, Judge. And so that's why I think it's not appropriate for the prosecutor to really get into all those details because we're just not prepared to address it.

Number three, the court has to look at the history and characteristics of the person, including the person's character. Well, what do we know about him? I had a chance to

speak with his fiancee this week. It appears that pretrial did as well. She's not here this morning because she has to work. It appears that -- well, not appears, Mr. Ahmad had what I believe was a religious conversion while in prison. He was using, unfortunately, drugs, including methamphetamine, during the spring of last year and even before that. And that's why he was convicted of simple possession back in I believe that was in 2012 or, I'm sorry, in 2016, and that is why he became involved in conduct later that year in June of 2017 that led him to serve a period of prison because he was, unfortunately, using drugs and was addicted and was not thinking clearly.

So he did have, when he was in prison in state court, a religious conversion. His fiancee indicated to me that when he left prison, which was at the end of September of this year, he spent one month out in the community here in Tucson and that he was attending the mosque every Friday. He woke up every day at 5:00 in the morning to pray, that he was incredibly responsible, incredibly clean, was not using any substances. He is on parole and was on parole during that month. And obtained work I think two days after his release from prison as a mechanic. I think that says a lot, Your Honor.

And further he was sentenced to two years in prison but was given not just early release credits but an additional four months of early release because of his very good behavior. In fact, he was housed at a very low-grade facility in Marana to

complete those state charges, that sentence, and during that stay earned very good behavior.

I was also informed that when he was initially arrested by federal authorities, he was held, I think, in isolation. I'm told that they checked his record in state court or within the state prison and moved him to general population because they deemed him to be no risk whatsoever and that he shouldn't be housed by himself.

Judge, regarding his family ties, his employment, et cetera, his fiancee is here in Tucson. They have a child together; that child is two years old. He has two children in Phoenix with whom he is close to. He -- when he was arrested for this case, which again happened one month after he was already in the community, he was bringing his two children with his fiancee from Phoenix when he got a phone call from the feds asking him where he was and indicating to him that, you know, that they wanted to talk to him.

Well, you know, if he was really dangerous, if he was really a person that wasn't interested in this case, he knew what was going on, he would have fled, he wouldn't have come back. But what did he do? He drove back to the apartment, met with them, and was arrested in front of his children.

Let's look at his -- his issues with drugs, Judge. Unfortunately, he did struggle with a drug problem. But, again, he has been clean for a year and a half. He is amenable

to being supervised, having an ankle bracelet, having to drop whenever the court wants him to, and has no records of failing to appear. Yes, there is a violation of probation in his record but that was from several years ago and, as the court knows, people do change. People do change, Your Honor. He was not on any kind of probation or parole during the commission of this offense which predates his time in prison.

Judge, there is absolutely no danger at all, no danger at all for the court to release this young man. The FBI and the federal government knew exactly where he was. They did not file a writ to have him brought to federal custody while he was in state custody. If they thought he's such a dangerous person, if they thought that he was a risk of flight, they would have made sure that this took place. The fact that he didn't shows that even they don't believe he's a flight risk.

He has family, he has children, he's clean now. He wasn't clean back in March or April of last year which may have contributed to the actions that led to this arrest. As you know, Judge, are there conditions or a combination of conditions that would reasonably assure the appearance of him for court in this case? Is he a serious flight risk? Only in rare cases should release be denied and I don't believe that this is a rare case. I think that if he had committed this offense on probation, if he had a record of violence, if there was some more information that indicated that he was truly a

flight risk, I don't think that -- I think that would be very different.

The serious charges in and of themselves, Judge, are not enough to justify detention on basis of flight risk. And so the court has to make the finding that there are no reasonable conditions, including third-party custody. His mother, I think, is a very good candidate to be a supervisor for him, Sabhia Kareem; she's here this morning; that he should maintain or seek employment, he has a job that he can return to as a mechanic; that he can avoid all contact with anyone the court deems inappropriate. He has to report to pretrial services on any basis the court deems reasonable, be complying with a curfew, an ankle monitor, no possession of firearms, no possession of weapons, et cetera, et cetera, Judge.

So I believe we have shown to you through proffers, through the pretrial services report very credible evidence to overcome the presumption in this case. We totally understand that if you look at the charges in and of themselves, yes, they are serious, we're not denying that they're serious, but, on the other hand, you have to weigh all the other equities in this case and I think if you do that, Your Honor, you'll see that this man should be released.

THE COURT: Okay. Okay. I'm -- I would note it appears that Mr. Ahmad's going to be a career offender. This would be his third drug felony. I'm also a little shocked that

the government is hanging their hat on this drug offense and that was their primary argument, but it is what it is. I have -- I have to think about it. I'm going to take it under advisement and I'll issue a written order on it.

So, Mr. Ahmad, I'll let your -- your attorney will find out what I decide, okay? Okay. Thank you, you can go with the marshals.

MR. GONCALVES: Thank you, Your Honor.

(Whereupon, the matter was concluded at 11:08 a.m.)

C E R T I F I C A T E

I, Cindy J. Shearman, court-approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter to the best of my ability.

s/Cindy J. Shearman
Cindy J. Shearman, RDR, CRR, CRC

November 5, 2018
Date