JON M. SANDS
Federal Public Defender
**JORDAN PERRY MALKA**
State Bar No. 6321055 (Illinois)
Assistant Federal Public Defender
407 W. Congress St., Suite 501
Tucson, AZ 85701
Telephone: (520) 879-7500
*jordan_malka@fd.org*
Attorney for Defendant

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **United States Of America,** | **CR18-02417-TUC-RCC (LCK)** |
| **Plaintiff,** | |
| **v.** | **MOTION TO DISMISS INDICTMENT FOR OUTRAGEOUS GOVERNMENT CONDUCT** |
| **Ahmad Suhad Ahmad,** | |
| **Defendant.** | |

It is expected that excludable delay under Title 18, United States Code, § 3161(h)(7) will occur as a result of this motion or an order based thereon.

Defendant, Ahmad Suhad Ahmad, through counsel, moves this Court to dismiss the indictment because the government's investigative conduct was outrageous and violated of his rights under the Fifth and Sixth amendments to the United States Constitution.

**RESPECTFULLY SUBMITTED:**     June 12, 2020.

JON M. SANDS
Federal Public Defender

*/s/Jordan Perry Malka*
**JORDAN PERRY MALKA**
Assistant Federal Public Defender

## I. Introduction

We can allow our policing powers to manipulate to infiltrate preexisting dangers to the community. However, to infiltrate the life of the average citizen, even someone who has committed prior bad acts, with the intent to manipulate to prove the unproven, is nothing more than outrageous. It is scary. It is an abuse of power, and, if it is within the legal limits of the Constitution, anyone can be its next victim.

In this case, government agents acted outrageously by baiting Mr. Ahmad to provide them with a bomb recipe, to teach them to construct two explosive devices, and to sell them heroin. Prior to this investigation, Mr. Ahmad never engaged in activities of this sort, and, but for government agents engineering this criminal scheme, Mr. Ahmad would have never committed such acts.

The government's investigative conduct was so shocking to due process values that the Court must dismiss the indictment.

## II. Facts

In July 2016, agents received information from a "potential confidential human source"[1] that Mr. Ahmad and his brother were building, selling, and detonating pipe bombs at Mr. Ahmad's place of business, a car yard adjacent to Davis-Monthan Air Force Base in Tucson, Arizona. *See* Exhibit A, photograph depicting car yard and Davis-Monthan Air Force Base. The source also informed agents that Mr. Ahmad was unstable, disliked America, and had weapons and drugs at the car yard. However, the information about Mr. Ahmad's dislike for the U.S. was invalidated. Government reports indicate that the brothers were only religious Muslims "for show" and did not belong to any known terrorist organizations.

On September 9, 2016, agents again met with the "potential confidential human source." However, by this date, the government officially recognized this individual as a confidential source – source 78036. At this meeting, source 78036 informed agents that, on or around July 4, 2016, Mr. Ahmad and his brother detonated a pipe bomb at Mr.

---

[1] The true identity of this confidential human source is unknown to the defense at this time.

Ahmad's place of business. The blast was so powerful that source 78036 felt the pressure from the explosion in his chest.

On September 28, 2016, federal agents formally initiated an investigation into Mr. Ahmad and his brother, Muhammed Ahmad. Initially, the matter was investigated by the Pima County Sheriff's Department (PCSD); however, after PCSD's initial undercover investigation ended without success, they closed their investigation and deferred all further investigations to federal agents.

On September 29, 2016, the government began aerial surveillance on Mr. Ahmad's car yard.[2] The surveillance never recorded Mr. Ahmad or his brother building, selling, or detonating any explosive devices.

On October 4, 2016, source 78036 again met with federal and state agents. At the meeting, the source shared additional information about their July 2016 contact with Mr. Ahmad that was previously unreported by agents, primarily that the pipe bomb explosion occurred at the car yard and underneath a white Ford Crown Victoria, causing great damage to the vehicle. The blast of the vehicle was so loud and powerful (the source felt pressure in his chest from the blast while standing 40 yards away) that source 78036 immediately left the car yard after the explosion for fear of arrest by law enforcement. Source 78036 told agents he had a video of the detonation, but no such video was ever located.

Source 78036 also provided agents with a sketch of the July 2016 detonated pipe bomb (Exhibit B) and stated that "it was his understanding" that Mr. Ahmad sold five similar pipe bombs to "Rafa,"[3] an individual source 78036 introduced to Mr. Ahmad, and other "Mexicans" associated with the Paisas gang that day.

---

[2] In addition to September 29, 2016, the government performed aerial surveillance on Mr. Ahmad on the following dates: November 15, 2016; November 16, 2016; November 22, 2016; November 29, 2016; December 23, 2016; January 4, 2017; January 10, 2017; June 6, 2017; June 7, 2017; June 9, 2017, June 19, 2017, and June 27, 2019.

[3] "Rafa", the individual source 78036 introduced to Mr. Ahmad, had either been arrested or convicted of the following: discharging firearm within city limits, burglary in the 3rd degree, theft, marijuana distribution/possession, drug paraphernalia, failure to appear, possession of weapons by prohibited person, marijuana for sale, theft of means of transportation, and alien smuggling. The true identity of "Rafa" is unknown to the defense at this time.

On October 12, 2016, the Pima County Sheriff's Department visited Mr. Ahmad at his place of business after unknown flashes were reportedly seen there. After their arrival, deputies discovered the flashes were from contained fires constructed to repel mosquitos. The deputies never reported seeing heroin, pipe bombs, or pipe bomb detonation sites at the car yard.

On October 21, 2016, source 18382 made contact with the "Ahmad brother that had the longer hair and a short beard" at Mr. Ahmad's place of business. Source 18382 asked the Ahmad brother about a particular car part. They also made note of other individuals at the car yard and their clothing, types of vehicles parked at the yard, and other noticeable items on scene. Source 18382 never reported seeing heroin, pipe bombs, or pipe bomb detonation sites at the car yard.

On November 14, 2016, Task Force Officer Eric Rice contacted Mr. Ahmad through Offer Up, an online local marketplace similar to eBay. Officer Rice expressed interest in one of the vehicles Mr. Ahmad listed online for sale.

On November 16, 2016, confidential human source 18382[4] made contact with Mr. Ahmad at his place of business. The purpose of the contact was to follow-up on Officer Rice's initial message to Mr. Ahmad through Offer Up. Source 18382 inquired about a car during his meeting with Mr. Ahmad. Source 18382 also stated that Mr. Ahmad showed them guns and drugs. Government reports, however, do not indicate when or how the conversation shifted from cars to guns and drugs during source 18382's meeting with Mr. Ahmad.

On November 26, 2016, two significant events occurred. First, Mr. Ahmad's vehicle was stopped and searched by local law enforcement in town, and he was ultimately arrested for a drug possession violation. Importantly, during their search of both Mr. Ahmad and his vehicle, officers did not find bomb-making materials.

Second, Mr. Ahmad's car yard was broken into and a trailer housing Mr. Ahmad's friend, Ali Hatif, was burglarized. The incident was reported, and during law

---

[4] The true identity confidential human source 18382 is unknown to the defense at this time.

enforcement's multiple visits to Mr. Ahmad's yard to investigate the matter, and from their review of the PCSD Pole Surveillance Camera's monitoring the scene, there were no reports of bomb making materials found, or of any sites used for detonating homemade explosives seen. There was also no indication anyone used the yard to sell heroin.

On November 30, 2016, confidential human sources 18438 and 79045[5] made their first contact with Mr. Ahmad at the car yard. Sources 18438 and 79045 were the primary sources throughout the government's investigation. The purpose of their visit to the yard was to look at a Ford engine Mr. Ahmad posted for sale.

On December 1, 2016, sources 18438 and 79045 visited Mr. Ahmad at his place of business on two occasions. The first visit was to offer Mr. Ahmad money ($100) to construct a radiator to conceal money. The second visit was to give Mr. Ahmad a $100 deposit for future work on the sources' vehicle. It appears, however, that no work was done on the sources' vehicle and that the sources ended up gifting Mr. Ahmad the $100.

On December 3, 2016, an unknown source visited Mr. Ahmad at his place of business. The source asked Mr. Ahmad to inspect his vehicle for an undisclosed reason. During the inspection, Mr. Ahmad located ammunition in plain sight in the back seat of the vehicle.[6] Before the source left the car yard, he promised to gift Mr. Ahmad a car battery charger since Mr. Ahmad did not own one.

On December 5, 2016, sources 18438 and 79045 arrived at Mr. Ahmad's place of business. This was their second attempt that day to locate Mr. Ahmad at his work. After a brief conversation, Mr. Ahmad offered source 18438 an auto mechanic job at his yard with pay at 25% of the yard's overall proceeds.

---

[5] The identities of confidential human sources 18438 and 79045 are unknown to the defense at this time.

[6] In December 2018, USA Today published an article on Mr. Ahmad and the role confidential informants played in his arrest. According to the article, the informant left the ammunition in plain sight in the back seat of his vehicle to lure Mr. Ahmad and to gain his attention: "The Informant said he took his car to the Tucson auto shop where Ahmad worked and left some bullets inside his car to catch Ahmad's attention." Gus Garcia-Roberts, *Confidential informants are supposed to keep their work confidential. These two didn't*, USA Today, December 4, 2018, https://www.usatoday.com/story/news/2018/12/04/fbi-informant-dishes-backstory-case-against-ahmad-suhad-ahmad/2161931002/ (last visited Apr 27, 2020).

On December 7, 2016, sources 18438 and 79045 visited Mr. Ahmad at his place of business. Mr. Ahmad and the sources spoke about cocaine prices and Mr. Ahmad's ability to purchase methamphetamine. They did not discuss heroin.

On December 17, 2016, sources 18438 and 79045 visited Mr. Ahmad at his place of business. Source 79045 reported that Mr. Ahmad spoke with him about constructing an unsophisticated bomb using a bucket filled with gasoline. This was the first and only recorded report source 79045 made throughout this entire case.

On December 22, 2016, sources 18438 and 79045 visited Mr. Ahmad at his place of business. Source 18438 reported that Mr. Ahmad commented about his dislike for President Bush since inspectors found no weapons of mass destruction after the U.S.'s invasion of Iraq. Mr. Ahmad also told source 18438 that militiamen used donkeys to conceal bombs during the Iraq war. When the sources asked how the bombs on the donkeys exploded, Mr. Ahmad said that people used cellphones to initiate the detonation. After this exchange, Mr. Ahmad resumed speaking with the sources about his auto repair work; however, within a few short minutes, source 18438 returned to asking Mr. Ahmad questions about bombs:

Source:      So what do you, have to, to do that?

Mr. Ahmad:  Do what?

Source:      With the phone?

Mr. Ahmad:  What do you mean?

Source:      But what do you put to, that thing to explode?

Mr. Ahmad:  You know what? Just go to Google. Google it. And they give
            you instruction how to make a bomb. Come on.

On January 2, 2017, source 18438 approached Mr. Ahmad at his place of business and asked if he and others could use the car yard for a drug transaction. The source offered Mr. Ahmad payment.

On January 30, 2017, sources 18438 and 79045 visited Mr. Ahmad at his place of business. The three discussed transmission issues on a vehicle. Source 18438 then shifted the conversation to heroin prices and asked Mr. Ahmad how much his supplier charged.

He later told Mr. Ahmad he would return with money to purchase heroin the following day:

> Source:       Hey, ask him how much he want for it now.
>
> Mr. Ahmad:  Okay.
>
> Source:       Hey, let me take a little pinch.
>
> Mr. Ahmad:  Huh?
>
> Source:       So, I show it to the guy just one pinch.

On January 30, 2017, the Domestic Terrorism Operations Unit notified the Department of Defense they opened an investigation on Mr. Ahmad and his brother.

On February 2, 2017, agents met with source 31812.[7] Source 31812 did not believe that Mr. Ahmad or his brother had connections to known terrorist organizations such as Al-Qaeda. Source 31812 stated that Mr. Ahmad and his brother were "wannabe gangsters."

On February 8, 2017, sources 18438 and 79045 visited Mr. Ahmad at his place of business. The FBI agents reported that heroin, or "negra," was reportedly valued by Mr. Ahmad at $35 a gram and that 45 grams were available for sale. However, the transcription of the sources' meeting with Mr. Ahmad on this date does not reveal this information. In fact, the transcription reveals no conversations about heroin, but instead a racist comment by source 18438:

> Source:       Como esta, Pancho (nickname for Mr. Ahmad)?
>
> Mr. Ahmad:  Same ol, same ol, just working.
>
> Source:       Working like a negro?
>
> Mr. Ahmad:  Not really. [Unintelligible], yeah [unintelligible].

Source 18348 also referred to a $30 entrance fee to travel into Mexico, not a price per gram of heroin:

> Source:       [Unintelligible] if you wanna go to Mexico they're going to charge you thirty bucks.

There was no reference to heroin or heroin prices in the transcription.

---

[7] The true identity of confidential human source 18382 is unknown to the defense at this time

On February 15, 2017, sources 18438 and 79045 visited Mr. Ahmad at his place of business. Source 18348 wanted Mr. Ahmad to locate heroin for them. After Mr. Ahmad deviated from the conversation and began speaking about other unrelated matters, source 18438 said, "Hey, so what do you think, 35 bucks a gram or less?" Mr. Ahmad attempted to shift the conversation to other topics, but again source 18438 tried to focus Mr. Ahmad on heroin: "Hey so, let's focus on that [unintelligible]. If I buy a hundred grams, 30 bucks a gram." Mr. Ahmad had no response: "Well I gotta ask him, it's not mine." Source 18438 ended the conversation with, "Well text me."

On February 16, 2017, source 18438 visited Mr. Ahmad and his brother at Mr. Ahmad's place of business. Source 18438 followed-up with Mr. Ahmad about purchasing heroin: "What did they tell you?" Mr. Ahmad ended the conversation over heroin by telling the source to let him know what to do.

On February 27, 2017, sources 18438 and 79045 visited Mr. Ahmad at his place of business. Mr. Ahmad did not anticipate the sources' arrival, nor their demand for heroin, and this frustrated source 18438.

Sources 18438 and 79045 waited for Mr. Ahmad for over thirty minutes. Then, they ordered Mr. Ahmad's brother to contact Mr. Ahmad to complete the heroin transaction. Source 18438 was recorded saying, "How long 'til he's fuckin' here?" and "Tell him right away or I leave." After Mr. Ahmad's arrival, he still did not have the heroin for source 18438. Eventually, Mr. Ahmad told source 18438, "We can do whatever you want to do," and, shortly after, source 18438 responded with, "Oh yes, I don't want to get involved, so it's ten [unintelligible]. So, three hundred is yours."

During this meeting, source 18438 pressed Mr. Ahmad to rent out his shop for a few hours to facilitate a large drug deal. At first, Mr. Ahmad stated no: "Which – what are you trying to do? Talkin' about – I don't want to get in trouble, you know . . . I have a family – I have family right here, you know? I don't want, like, for this little shit yeah, I do, but big shit, you know." The source responded, "It's not big shit. You – I will pay you." The conversation ended with the source saying, "I don't know, we talk tomorrow."

8

Source 18438 then shifted the conversation to discuss his failed attempt to detonate a gasoline bucket bomb while in Mexico: "I look, like, really stupid." Mr. Ahmad and source 18438 discussed what source 18438 did wrong to construct the explosive device, and then, once more, source 18438 told Mr. Ahmad he felt stupid: "No, but it didn't explode. I looked, like really stupid. I said - ."

Mr. Ahmad offered to go to Mexico to review the problem, but source 18438 did not address Mr. Ahmad's comment; instead, he stated, "How much you charge me if I know how to do that one?" Mr. Ahmad, who had just made $300 from source 18438 and considered him a close friend, informed him he would provide him with instructions the following day. Source 79045 ended the meeting by telling Mr. Ahmad he loved him. Mr. Ahmad responded with, "I love you, too."

On March 4, 2017, sources 18438 and 79045 visited Mr. Ahmad at his place of business. Before entering the premises of Mr. Ahmad's car yard, an audio recording recorded the source in Spanish, "I'm – we're going to [unintelligible] the fucking shit with a bomb, too." This meant the sources were going to return to their government handlers with more information on the bomb.[8]

Mr. Ahmad's brother was the only individual at the car yard when the sources showed up, and he knew source 18438 wanted more heroin. Source 18438 stated the following to Mr. Ahmad's brother:

| | |
|---|---|
| Source: | So tell him [Mr. Ahmad] that, a hundred. |
| Mr. Ahmad's brother: | The what? |
| Source: | A hundred. |
| Mr. Ahmad's brother: | A hundred what? A hundred. |
| Source: | A hundred grams. |
| Mr. Ahmad's brother: | A hundred grams? |

---

[8] The USA Today article confirmed from the informant that he, not Mr. Ahmad, first brought up bomb building: **"He continued to visit the auto shop and befriended Ahmad. The Informant said he first bought drugs from Ahmad before shifting their conversation to making bombs."** *Confidential informants are supposed to keep their work confidential. These two didn't*, *supra* note 6 (emphasis added).

Mr. Ahmad's brother eventually called Mr. Ahmad on behalf of source 18438: "Well yeah, but you're the, well tell him [Mr. Ahmad] that he's gonna be a handler, and her, he must be for sure Tuesday, tell him for sure Tuesday." Source 18438 then told Mr. Ahmad over the phone he loved him: "I love you, Poncho." The meeting ended with the sources and Mr. Ahmad's brother discussing payment for the brothers' services.

On March 7, 2017, sources 18438 and 79045 visited Mr. Ahmad at his place of business. Source 18438 went straight to discussing heroin: "[unintelligible] stuff?" Mr. Ahmad was not immediately concerned with source 18438's request for heroin; instead, he was focused on his work on a particular vehicle:

Mr. Ahmad:  It's turbo.

Source:       What?

Mr. Ahmad:  Turbo.

Source:       Turbo?

Once the conversation returned to heroin, source 18438 asked Mr. Ahmad if he should return later since they both learned the heroin supplier (Mr. Ahmad's car yard neighbor) was unavailable. Mr. Ahmad informed source 18438 that the supplier should return soon.

Source 18438 told Mr. Ahmad that people would occupy his car yard for only one hour to conduct a drug transaction and that Mr. Ahmad would make money from this. Since Mr. Ahmad had no details about the handoff time, the amount of people arriving to the car yard, or the type of drugs offloaded, he was concerned with source 18438's plan:

Mr. Ahmad:  Yeah, because boss is back. But by what time you wanna use it?

Source:       I don't know. I will let you know.

Mr. Ahmad:  Like, I wanna—I wanna know the time.

Source:       Well, yeah, I will let you know the time. But, you know—you
              know, like, I'm not gonna show up without say anything.

Later, a recording captured Mr. Ahmad hesitating about using the car yard to conduct source 18438's drug sale:

Mr. Ahmad:  I don't wanna deal with people.

Source:       So, how long you think 'til he [Mr. Ahmad's boss] get back?

| | Mr. Ahmad: | I don't know. He's—he—He's coming back from the house |
| | | right now. |
| | Source: | A thousand or maybe three hundred from there? I will let you |
| | | know like a few days before we use it. I'll only be like for an hour. |
| | | How often do [unintelligible] come? |

After this exchange, source 18438 went back to discussing his desire to purchase heroin:

| | Source: | Oh. Hey, should I come back later or what do you think? |
| | Mr. Ahmad: | Let me call you—let me—let me talk to Pancho and see. |
| | Source: | I thought he'd have it by now, you know? And I went to pick |
| | | up the money [unintelligible], you know. |

Then, once more, source 18438 returned to discussing his drug deal at Mr. Ahmad's car yard:

| | Source: | He, Friday—you gonna be here Friday? |
| | Mr. Ahmad: | No, I'm gonna be back home in Iraq—of course we're here. |
| | | Where I'm gonna go? |
| | Source: | I might just drive by the shop, you know, to [unintelligible] |
| | | okay we use it. [unintelligible] thousand bucks but you give |
| | | me two hundred. |
| | Mr. Ahmad: | No I told him, twelve hundred. You get the two hundred and I get a |
| | | thousand bucks, how's that? |
| | Source: | Well, let's see. |
| | Mr. Ahmad: | What he—what he's doing what are you gonna do? |
| | Source: | It's gonna be a couple pounds for each tire, that's it. But |
| | | we're—I will let you know a few days before we do it. |
| | Mr. Ahmad: | Yeah, but I wanna know more, what is—what is the deal? |
| | | I'm not gonna have [unintelligible] again. No, no, no, but I |
| | | wanna—I gotta know, you know? So, if something happen, |
| | | you know, I know how to put myself out. |

Before the sources left the car yard, the conversation returned to Pancho, the heroin supplier that source 18438 wanted Mr. Ahmad to contact:

Mr. Ahmad: Okay, so, let me—let me—let me—let me talk to Pancho and see what's up.

Source: You think—but I gotta get—because I got the money—

Mr. Ahmad: You gotta wait. Appreciate when I get it, I—I—I just wait, you know, I'll be patient with it, you know? Because sometime I get [unintelligible] stuff—[unintelligible] stuff.

Source: You told that, when you get a—okay, he tell you a couple days, right?

Mr. Ahmad: Mhmm.

Source: So—

Mr. Ahmad: Like the other time when I told you [unintelligible].

Source: N-no bullshit, show him the money.

Mr. Ahmad: Bro, no. I know—I know.

Source: You know I'm not gonna bullshit you.

Mr. Ahmad: Oh, I believe you.

…

Source: Hey, um, so give me a call [unintelligible] but for sure 'cause we don't have to be [unintelligible].

Mr. Ahmad: I told you. I gotta see and I told you [unintelligible].

Source 18438 ended the meeting by telling Mr. Ahmad he would follow-up with him on Friday about using the car yard for his drug deal.

On March 10, 2017, source 18438 visited Mr. Ahmad at his place of business. Undercover employee (UCE) 6250 accompanied him. The purpose of their visit was to reserve Mr. Ahmad's car yard for the large drug deal. UCE 6250 informed Mr. Ahmad that the deal would not take long to complete. The deal, according to UCE 6250, would only be with, "…a van and two cars. Cause we're gonna [unintelligible] put it in the cars and that will be it." UCE 6250 later told Mr. Ahmad, "Yeah. No, I-I like this very discreet

place here. Um. Afterwards, after we do the stuff, and get done here, we will keep your place here. Um. Afterwards, after we do the stuff, and get done here, we will keep your place clean. We'll leave, and I'll meet you out in Vegas. You know, ah pay Antonio and give him the money." This was the first time they told Mr. Ahmad he would be traveling to Las Vegas. There were no prior discussions or agreements between Mr. Ahmad and the sources and agents to travel to Las Vegas.

Before the meeting ended, UCE 6250 confirmed with source 18438 that others could use Mr. Ahmad's car yard to conduct the drug deal. UCE 6250 further requested that someone clear an area of Mr. Ahmad's yard of cars so UCE 6250 and the others could easily access the area with their vehicles to complete the drug transaction.

Before everyone parted ways, source 18438 made one last request for "tacos," or heroin, but Mr. Ahmad informed source 18438 that he did not know about Pancho's inventory status. After the meeting concluded, UCE 6250, one of the first government agents to enter Mr. Ahmad's car yard, made no reports of bomb making materials seen at the car yard, or of any obvious sites on the yard where homemade explosives had been detonated.

On March 15, 2017, sources 18438 and 79045 visited Mr. Ahmad at his place of business. Source 18438 confirmed with Mr. Ahmad that UCE 6250 would use the car yard to complete a drug deal on March 24, 2017, and that Mr. Ahmad would receive money in exchange for allowing the agents to conduct the drug deal.

Source 18438, once more, brought up his failed attempt to build a bomb using a bucket and gasoline. Mr. Ahmad told source 18438 to use a metal bucket, to which source 18438 stated, "I gotta pay you, then you show me everything. And I gotta tell these guys to charge for more money." Source 18438 left the car yard telling Mr. Ahmad he would see him in the morning.

On March 17, 2020, source 18438 met with Mr. Ahmad at his place of business. Source 18438 again confirmed UCE 6250's drug deal at Mr. Ahmad's car yard on March 24, 2017. Since Mr. Ahmad was unaware of the details of UCE 6250's plan, he asked source 18438 to clarify the number of people and cars that were to arrive at the shop and the time needed to conduct their business. Source 18438 tried to answer Mr. Ahmad's

questions. Source 18438 was, however, unsure about the number of vehicles UCE 6250 planned to use.

Before the meeting ended, source 18438 again brought up constructing a bomb using a bucket with Mr. Ahmad. Source 18438 asked Mr. Ahmad, "Will you teach me how to do?" Mr. Ahmad stated, "I'll show you." Mr. Ahmad claimed to have used the bucket method to kill pigeons in Iraq.

On March 24, 2017, sources 18438 and 79045 visited Mr. Ahmad at his place of business before UCE 6250's drug deal was to take place. Because Mr. Ahmad had problems with the property owner and difficulty accessing the yard due to locked gates, he considered renting another yard.

Source 18438 again brought up building a bomb using a metal bucket with Mr. Ahmad: "So, Pedro, when are you gonna show me to kill the pigeons." Mr. Ahmad told source 18438 he needed a metal bucket, something described as milk, and a few other items not clearly recorded by source 18438's recording device. Mr. Ahmad told source 18438 that putting a grenade inside the bucket is another option. Source 18438 could use fishing wire to detonate the grenades. Source 18438 took the conversation further:

Source:      You, like, if you put it on somebody's car, you will kill the guy?

Mr. Ahmad:  What do you mean?

Source:      Like, if you put it close to a car?

Mr. Ahmad:  Close to a car? Yeah.

Source:      But if—what if the guy's inside?

Mr. Ahmad:  You can do—do—do you guys do it from the front?

Source:      No, I don't know how to do it.

Mr. Ahmad:  You don't know how to do it?

Source:      Is it hard?

Mr. Ahmad:  It's not hard, is—is just the problem, is, okay, you get battery, like, battery—the big one?

Mr. Ahmad told source 18438 how to connect wires to a battery source, which would provide the power to detonate the device.

Source 18438 continued to ask Mr. Ahmad questions, and Mr. Ahmad tried to answer. Source 18438 asked Mr. Ahmad the following questions to carry on the conversation about building bombs:

- But what else can I use to—to—to make the spark?
- To see explode—dynamite or no?
- Why did you show me how to hook up the phone? No, no, no, but if I bring the phone here, you show me how to do it.
- No, but how much you charge me, you come help him in Dallas or just make one for me.
- But how do you [unintelligible] the cable? Do I put 'em with a [unintelligible}?
- That's it?

Mr. Ahmad informed source 18438 that his desire for a bomb would cost a lot of money and that he would not construct anything for him in the U.S. In fact Mr. Ahmad stated, "Um, uh, I just need a—a good person, you know, like I don't wanna do this bullshit but I don't wanna end up--" Mr. Ahmad was interrupted by source 18438's eagerness: "But so--". Mr. Ahmad finally stated, "—you known, I don't wanna end up in Guantanamo."

Source 18438 continued the conversation: "Say, but these ones, like, if we put, like from here to that corner, I just [unintelligible]." Mr. Ahmad eventually confirmed that source 18438 could ascertain a positive charge from a cell phone battery to make an explosive device. After, the following was then said:

Source:       So, how much you charge me for teaching me to do that one?

Mr. Ahmad:  Well, I don't wanna charge you because then I be criminal, you know, I wanna do that.

Source:       For free?

Mr. Ahmad:  No, I'll—I'll tell—I shouldn't have to do it.

Source:       Hey, so, but if I—we put it down to—in Mexico and I call from here—

Mr. Ahmad:  Yeah, you call him from fucken a casino, that's all. You'll [unintelligible].

Source:  I let him go.

Mr. Ahmad:  It'll blow the shit out of him.

By the end of the day, UCE 6250 completed his drug deal and paid Mr. Ahmad $1,000 for allowing him to conduct it at his place of business.

On March 29, 2017, source 18438 visited Mr. Ahmad at his place of business. According to the FBI, a digital body recorder recorded the meeting; however, to defense counsel's knowledge, there is no audio file of the meeting.

During the meeting, source 18438 informed Mr. Ahmad that, due to a dispute over money, UCE 7581 wants to kill a Mexican commandant using a car bomb. Source 18438 invited Mr. Ahmad over to his place on April 4 to discuss both this plan and how they could make money together.

On March 30, 2017, source 18438 visited Mr. Ahmad at his place of business. The conversation was short and mostly concerned unrelated issues to the present case. Source 18438 confirmed with Mr. Ahmad that they would meet later.

On April 4, 2017, Mr. Ahmad and source 18438 met at the Tucson Mall before meeting with UCE 7581 at source 18438's house. The purpose of the meeting was to confirm a price for source 18438 to charge UCE 7581 to construct a bomb. Mr. Ahmad informed source 18438 that the materials needed to construct the bomb, including the explosives, are expensive. He also informed source 18438 that he does not know where to purchase the explosives and that source 18438 would have to locate the explosives and the extra materials to construct the bomb.

During the meeting, source 18438 repeatedly asked Mr. Ahmad for a price to charge UCE 7581 to build a bomb: "So how much you think I can sell these to Rueben (UCE 7581)? [unintelligible] how much you think I can charge him?" Source 18438 also asked Mr. Ahmad follow-up questions about constructing the bomb, such as, where to connect wires, how to construct a device using a phone, and how to detonate a device near a bulletproof car.

Then, the conversation shifted, and source 18438 asked Mr. Ahmad how much he would charge to construct the device for source 18438:

Source:         You put everything together for me--

Mr. Ahmad:  Huh?

Source:         --and [unintelligible], cause I don't wanna be in danger of fucking up my house.

Mr. Ahmad:  No, I understand, yeah. [unintelligible].

Source 18438 tried to secure a deal with Mr. Ahmad for four thousand dollars:

Source:         How much money? Four thousand?

Mr. Ahmad:  Yeah.

Source:         How much you want?

Mr. Ahmad:  Whatever you give me, bro.

Source:         Oh, no, no, no I [unintelligible] you know and I want to learn. [unintelligible] but its fucking hard.

Mr. Ahmad:  Whatever.

Source:         Will you go half?

Mr. Ahmad:  Yeah?

Source:         On no, you'll bring em. You can turn [unintelligible].

Mr. Ahmad:  Whatever you want bro.

Source:         [Unintelligible], and I learn.

Mr. Ahmad:  Whatever you want.

Source:         And if I have any questions I call you, and I bring you wherever I am.

After the above back and forth, Mr. Ahmad informed source 18438 that, depending on the type of bomb source 18438 wanted, he could have his cousin send him instructions. Source 18438 once again asked Mr. Ahmad's price to build the bomb: "Hey so, four thousand, you keep three, I keep one. And then um, will you get, you get the phone and everything."

The conversation about price continued, but Mr. Ahmad never gave a firm answer. "Oh. So one thousand, forty five hundred. We'll see how much I make. Forty-five hundred.

So you make two thousand, and I make fifteen hundred. No, but you need the phone-the phone and pulling the wire, and the only think you need is explosives, right?" A few seconds later source 18438 again brought up payment to Mr. Ahmad: "So forty-five hundred, right? [Unintelligible] You keep three thousand and [unintelligible]. And give me [unintelligible]." Mr. Ahmad never confirmed a price.

Mr. Ahmad also informed source 18438 that he could not build a bomb in the United States:

> Mr. Ahmad:  We not gonna do it before [unintelligible] to Mexico, gotta do it in
> Mexico. [unintelligible].
>
> Source:  But you can put the thing together for me?
>
> Mr. Ahmad:  I can show you how to put it together. I'll show you if you
> have the phone and wire and everything.

After Mr. Ahmad and source 18438 returned to source 18438's apartment, UCE 7581 arrived. Source 18438 informed UCE 7581 that Mr. Ahmad knew how to construct a bomb using books and laptops, and he could detonate a bomb using a cell phone. Source 18438 then offered Mr. Ahmad's services to UCE 7581: "He will put it together." Mr. Ahmad, however, responded with the following: "You know, I-I can show you do it over there. For me, I-uh-I mean but I can't cross, but I'm on probation, I can't go and do it over there, you know." Ahmad's response surprised Source 18438 and UCE 7581:

> UCE 7581:  That's fine, I mean, the harder thing…
>
> Source:  He was gonna [unintelligible] everything [unintelligible].
>
> UCE 7581:  Ok. So you'll know to put that on, or…
>
> Source:  No, [unintelligible].
>
> UCE 7581:  But he's gonna show you how, I mean.

A few moments later, UCE 7581 insisted Mr. Ahmad build the bomb: "No, I re-no that's good. [Unintelligible] negative, but if you'll help put it together. Forty-five [unintelligible]." Mr. Ahmad eventually agreed to put the bomb together in a box for source 18438 to later assemble. Mr. Ahmad also provided source 18438 and UCE 7581

with directives to collect materials and to connect circuit wires.  He also informed agents that someone could detonate the device using a phone or a book.

Source 18438 then made the first known plans to travel to Las Vegas with Mr. Ahmad to construct the device: "Once we-I gotta see how much he's gonna charge, I'm [unintelligible] but it sounds like it's doable. What about the guy comes to Vegas with us, you know?"

Mr. Ahmad agreed to go to Las Vegas with the agents.  The agents confirmed that they had access to a plane and that all of Mr. Ahmad's expenses would be paid for. Before the meeting concluded, UCE 7581 stated, "Yeah, double check with me cause I wanna make sure we got the price, all the stuff we need, and then um the date when we can go when you're [UI]."

On April 11, 2017, source 18438 visited Mr. Ahmad near the location of Mr. Ahmad's new car yard.  Source 18438 asked Mr. Ahmad about traveling to Las Vegas for UCE 7581:

| | |
|---|---|
| Source: | Hey, uh, you gonna go to Vegas? |
| Mr. Ahmad: | I can't |
| Source: | Why? |
| Mr. Ahmad: | I can't go to Vegas. I'm on check. Tomorrow my court. |
| Source: | Oh, no, no, no, but it's like, on the 24th. |
| Mr. Ahmad: | Tomorrow's my court. If—I, uh, let me see what they gonna tell me. |

Source 18438 continued to press Mr. Ahmad about Las Vegas:

| | |
|---|---|
| Source: | No. To, just talk to the guy, explain to him, so but, we're leaving the 24th, you wanna go the 24th or no? |
| Mr. Ahmad: | Let's wait for. |
| Source: | Go and come back the 25th. |
| Mr. Ahmad: | The 24th is what? Which month? |

Source 18438 informed Mr. Ahmad there was a low risk of detection during their travels to Las Vegas since they had a private plane and planned to return after only one day. Mr. Ahmad was not convinced:

Mr. Ahmad: I just don't wanna get in trouble though, bro.

Source: No! No, no. it's fine.

Mr. Ahmad: Y-y-you feel what I'm saying?

Source: Yeah I know.

Mr. Ahmad: Not even by the government or by whatever, y'know?

Source: Yeah.

Mr. Ahmad: I don't wanna be in trouble, that why I like, I want to do—I-I.

Source 18438 asked Mr. Ahmad to show him how to construct the bomb, at the very least:

Source: Well you show me?

Mr. Ahmad: I do this, y'know, it's for you. Y'know, that me and you.

Source: Yeah.

Mr. Ahmad: That's why—you remember when the stuff come and get it out?

Source: Yeah.

Mr. Ahmad: It's just me and you, I don't deal with someone else.

Mr. Ahmad told source 18438 that he did not need to go to Las Vegas because he could learn to construct a device in Tucson:

Source: So he's gonna pay—yeah, he is gonna give you the money. I don't have the money, if I had the money, I give it to you. We leaving, the 24th, we be back the 25th.

Mr. Ahmad: And what we doin' over there?

Source: You're gonna show me how to put the thing together.

Mr. Ahmad: I show you here in Tucson?

Source: No! [UI]! I don't—I wanna make sure it works!

Mr. Ahmad: Well, we can fucking go desert and blow whatever.

Despite resistance, source 18438 convinced Mr. Ahmad to travel to Las Vegas.

Before the meeting concluded, Mr. Ahmad asked source 18438 to talk before their next meeting with UCE 7581 to review a few necessary tasks needing completion before the device could be built. Mr. Ahmad also did not want to use explosive materials such as C-4 or TNT, but instead preferred to construct his own explosive device using raw combustible materials. For this, Mr. Ahmad had instructions on his phone.

Mr. Ahmad and source 18438 met on April 11 or 13. Mr. Ahmad asked source 18438 if he retrieved the necessary items to construct the bomb. Mr. Ahmad also informed source 18438 that he had instructions to build a homemade explosive device with common household materials, but that he would not be traveling to Las Vegas: "I can't go. I told you. I don't [unintelligible] for nobody. Hm. But it think about, anything happen I'm gonna be gone for a few year. I don't like it when I drive far away from here, because [unintelligible]. But, we can do it." In response, source 18438 called UCE 7581 to meet them.

Mr. Ahmad told UCE 7581 he preferred building a bomb with homemade products instead of TNT or C-4. He also told them this would be his first time building a device of this sort:

Mr. Ahmad: You don't have Army. Now we have Army. But before when American invad Iraq, we had to take Army and everything, y'know? So we have citizens who fight American soldier. And what they can do—they can't, they can't get guns, or whatever, from out of state because all the border is secured by the American. Okay? So they start doing their own thing inside, we, we do missile out of the pipe, out of the water pipe—they do a missile.

UCE 7581: Oh, you can make a missile?

Mr. Ahmad: Yeah.

Source: Really—I thought they just do that in Mexico.

Mr. Ahmad: No, seriously, no joke. No joke, that's what they do.

Source: But he said it's a hundred percent it will work.

21

UCE 7581: This is [UI]—okay. How many have you done of these? How
many have you made?

Mr. Ahmad: I don—I didn't made none of these, but I, I sees—the, these
type of blogs, on people.

Mr. Ahmad told agents he would cook the materials to make the device combustible, and UCE 7581 confirmed the plan: "Okay. No, I-I believe you and I know you can probably make it. But since this is something your first time doing it, I want something that you feel comfortable that's gonna work. And if you need C-4, I'm okay getting C-4 for you, I don't mind paying the money." UCE 7581 knew what he needed from Mr. Ahmad: "I just need your brain and how to do it," and "…show him [source 18438] how to do it."

On April 16, 2017, source 18438 visited Mr. Ahmad's apartment. Neither Mr. Ahmad nor source 18438 could locate a cell phone with enough power to detonate an explosive device. Source 18438 also said that he had leads in Mexico for TNT or dynamite and asked Mr. Ahmad to send him the homemade bomb instructions in Spanish. At one point, Mr. Ahmad again displayed hesitation to travel to Las Vegas:

Source: He's coming to the fight. The fight - are you coming to Vegas or no?

Mr. Ahmad: When?

Source: Well we leaving the twenty-eighth. Are you-what do you
think? You want to make it here? What about your
probation?

Mr. Ahmad: That's the problem.

Source: Uh, [Unintelligible].

Mr. Ahmad: Three years you know.

Source: Yeah.

Mr. Ahmad agreed to look for a car alarm instead of a phone as a power source to detonate the bomb. Source 18438 planned to contact UCE 7581 about next steps.

On April 19, 2017, Mr. Ahmad and his brother met source 18438 and UCE 7581 at source 18438's apartment in Tucson. Mr. Ahmad was unsure about the exact quantity of "black powder" needed to construct the bomb, and so source 18438 requested that Mr.

Ahmad text him the instructions. This is the moment the government alleges Mr. Ahmad texted source 18438 bomb-making instructions.

On April 21, 2017, source 18438 visited Mr. Ahmad at his apartment in Tucson. Source 18438 informed Mr. Ahmad that they would use TNT explosives to detonate the bomb and not a homemade bomb recipe.

Mr. Ahmad again said he would not be traveling to Las Vegas with source 18438 because his probationary status for a state offense prevented him from travelling out of state, but that he could FaceTime with source 18438 while they were in Las Vegas. Mr. Ahmad and source 18438 also conversed about power sources to detonate the bomb and electric circuitry methods. Source 18438 informed Mr. Ahmad that he would follow-up with UCE 7581 about Mr. Ahmad's inability to travel outside of Arizona. Before the meeting concluded, source 18438 loaned Mr. Ahmad $40.

On April 23, 2017, UCE 7581 called Mr. Ahmad. Source 18438 was unable to reach him the day prior. UCE 7581 wanted to confirm that Mr. Ahmad would be traveling to Las Vegas on Wednesday, April 26, 2017. Despite hesitations, Mr. Ahmad agreed to travel to Las Vegas with UCE 7581.

On April 24, 2017, source 18438 and UCE 7581 placed a phone call to Mr. Ahmad. The three, plus Mr. Ahmad's brother, later met at Mr. Ahmad's place of business. At the meeting, Mr. Ahmad confirmed that he would be traveling to Las Vegas with UCE 7581 and source 18438 and that Mr. Ahmad's brother would stay behind in Tucson.

FBI reports indicated Mr. Ahmad expressed concern about the TNT's reliability at the meeting. The meeting concluded with Mr. Ahmad sharing his apartment number with source 18438 so that the agents, if necessary, could locate him.

On April 26, 2017, sources 18438 and 79045 met Mr. Ahmad at his place of business. Shortly after, Mr. Ahmad's brother drove Mr. Ahmad and the agents to a nearby Denny's Restaurant to meet with UCE 7581. UCE 7581 then drove sources 18438, 79045, and Mr. Ahmad to Tucson International Airport to board a private aircraft to Las Vegas. Mr. Ahmad arrived in Las Vegas around midday.

In Las Vegas, UCEs 7581, 6291, and 7335, and sources 18438 and 79045 worked together to provide Mr. Ahmad with equipment to build the bomb. UCE 7335 provided Mr. Ahmad with C-4 explosives (UCE 7581 unilaterally decided that C-4 should be used), blasting caps/fuses, motorcycle batteries, car alarms, wire cutters, gloves, zip ties, glue gun, tolls, suitcase to place the bomb in, backpack, and tape. Mr. Ahmad brought a knife, electrical wire, circuit tester, and epoxy. After someone ordered room service and everyone met, everyone but Mr. Ahmad and UCE 7335 left the room.

Ultimately, the bomb UCE 7335 and Mr. Ahmad constructed was not viable; the device was triggered by a car alarm system, but, since that plan did not work, they were required to go look for another car alarm system. Mr. Ahmad, UCE 7581, source 18438, and source 79045 eventually ended up at Fry's Electronics where they purchased another car alarm system. After, they returned to the hotel to complete the construction of the bomb.

After dinner and drinks, Mr. Ahmad went to his room for the evening. He and the sources had breakfast the next morning and departed for the airport to return to Tucson. Once in Tucson, they dropped Mr. Ahmad at his place of business.

On May 3, 2017, UCE 7335 called Mr. Ahmad to let him know that they may not use the bomb after all. Mr. Ahmad was uninterested:

UCE 7335:    Dang that's not bad. Yeah, it's in the 90's here today. Man, I talked to Ruben to—when I was talking to Ruben today, uh, man it doesn't look like that commandant may be coming through. He may not—he may not be coming up from Mexico—

Mr. Ahmad:  Who?

UCE 7335:    —for this thing this weekend, but—

Mr. Ahmad:  Yeah?

UCE 7335 then informed Mr. Ahmad that he would be in touch in the future. Mr. Ahmad responded, "[Unintelligible]. Yeah, I'm doing it for you—I'm doing it for you guys just for fun, you know, as friend. [Unintelligible].

24

On May 7, 2017, sources 18438 and 79045 visited Mr. Ahmad at his place of business. Source 18438 attempted to convince Mr. Ahmad to go to Mexico with him for work:

Source:      So you will drive down to Mexico?

Mr. Ahmad:  Drive, with you.

Source:      With me.

Mr. Ahmad:  Hell, yeah. To do what?

Source:      The guy won't show up in Vegas.

Mr. Ahmad:  [Unintelligible].

Source:      Yeah, but Mexico we need a bigger one because he's in a
             bullet proof car. So can you go in or no.

Mr. Ahmad initially agreed to travel to Mexico since he could make a lot of money, but then told source 18438 that it would not be possible.

Mr. Ahmad also informed source 18438 about a friend that was shot and his need for a gun. Source 18438 had very strong response for Mr. Ahmad: "Fuck. You need to kill that fucker," and "You need to kill that fucker." The conversation ended with source 18438 telling Mr. Ahmad that he would get in touch with his handler and get back to Mr. Ahmad soon: "You make money and I make money."

On May 20, 2017, Mr. Ahmad met with source 18438 at source 18438's apartment. Mr. Ahmad and source 18438 conversed over a beer about source 18438's kidney stones and Mr. Ahmad's desire to start a towing company. Source 18438 also asked Mr. Ahmad to travel to Miami, Florida, to meet with source 18438's handler to build another bomb using a cell phone. Mr. Ahmad was interested in this opportunity.

On May 26, 2017, Mr. Ahmad met with source 18438 at the source's apartment. Source 18438 asked Mr. Ahmad how much he would charge to construct a bomb out of a laptop for UCE 7581. Mr. Ahmad was interested in the proposition, but unsure how to complete the request:

Source:      Yeah. How much you think?

Mr. Ahmad:  I don't know.

| | |
|---|---|
| Source: | And we don't do nothing. |
| Mr. Ahmad: | But, I don't know because I'm not doing this every day. |
| Source: | Yeah, I know. |
| Mr. Ahmad: | I have tried before. |
| Source: | Think about it and let me know before I tell him something. Or I wait for him to get back and you tell him that, you know, you get that why we give him the stuff to make it we don't have do nothing. |
| Mr. Ahmad: | Ok, I can do that. |

Before the conversation ended, source 18438 unilaterally decided that he would tell his handler that Mr. Ahmad could make the laptop bomb:

| | |
|---|---|
| Mr. Ahmad: | Okay if you want some food I'll have my lake make some food. |
| Source: | Okay so I will tell them that you can do it. |
| Mr. Ahmad: | Okay. |
| Source: | Okay man. |

On June 3, 2017, Mr. Ahmad met with source 18438 and UCE 7581 at an unknown restaurant. Source 18438 and Mr. Ahmad spoke about building a bomb using a laptop. Mr. Ahmad claimed that someone could build it, and agreed to show UCE 7581 how to assemble the device. However, UCE 7581 did not want Mr. Ahmad to construct the device; instead, UCE 7581 wanted Mr. Ahmad to send him the bomb building instructions in English. For this, the agents promised Mr. Ahmad even more money: "You know well I'm-I'm actually the one getting the contract you know. Well Brian, um, and if it works, everything goes good, I'll bump you to even more. I'll double [unintelligible]."

UCE and source 18438 also encouraged Mr. Ahmad to bring his cousin from Iraq to the United States to work for UCE: "Pay ten thousand a month here," and, "It's closer for him to go to Europe. He could probably slide over." Source 18438 even suggested that "Enrique" go with Mr. Ahmad to Iraq to smuggle his cousin into the United States

Before dinner concluded, Mr. Ahmad informed UCE 7581 and source 18438 that his wife knew about his activities with them, and that he is not interested in hurting anyone:

"If she like it, she don't like it, I'll be like okay I'm gonna stop [UI]. I know what I'm doing. So rather, she know I'm doing we get-we get to like hey look what I'm doing like this, you know? I'm, not gonna go I'm not, understandable gonna go shoot people you know, your business."

UCE 7581 told Mr. Ahmad he would be in touch with him soon about building a device using a laptop.

On June 5, 2017, source 18438 made an unexpected visit to Mr. Ahmad's apartment to confirm he had a laptop and would be prepared to show agents how to construct a bomb.

On June 6, 2017, source 18438 and an unknown UCE called Mr. Ahmad to firm up plans to meet on June 7 to have Mr. Ahmad demonstrate how to build a bomb using a laptop. Mr. Ahmad stated that he was available to meet on June 7, but that he sold the laptop he previously purchased to build the agents a bomb. He mentioned that he would purchase a new laptop for the meeting on June 7. The phone then disconnected before the conversation ended.

On June 7, 2017, Mr. Ahmad met with sources 18438, 79045, and UCEs 7335 and 7581 to show them how to build a laptop bomb using instructions that Mr. Ahmad's cousin shared with him. The bomb, according to UCE 7335, would kill a "snitch" within their organization. Mr. Ahmad, however, said he had no interest in knowing what the laptop would be used for: "You know? And I give you my product and you gonna do whatever you wanna do wit it." UCE 7335 insisted that Mr. Ahmad know about the purpose of the bomb because Mr. Ahmad was "…like a consultant" to the organization.

Mr. Ahmad attempted to demonstrate how to disassemble and then reassemble a laptop to function as a bomb. The bomb was to detonate once the laptop's power source was turned on; however, since the construction seemed overly complicated, the agents believed it would be better for Mr. Ahmad to travel to Miami to construct them a bomb there.

After some time watching Mr. Ahmad toggle with wires and computer parts, agents became concerned with Mr. Ahmad's instructions and his ability to construct a laptop bomb, generally:

| | | |
|---|---|---|
| UCE: | No, that's the whole thing. I mean, we got one shot at it and it has to work so— | |
| Mr. Ahmad: | Yeah, well and—and— | |
| UCE: | The only—the only concern I have, is—is since you haven't done this before. I mean, if your getting it from your cousin, and your cousin got it for something else. | |
| Mr. Ahmad: | Yeah—yeah well, to be honest I—thou—I didn't ask him to teach me how to do it. | |
| UCE: | Okay. | |

Mr. Ahmad said that his cousin told him that the device relied on the computer's power source. He figured he could assemble materials generally because of his knowledge of wiring from working on cars.

Then, after speaking with the agents about the current state of affairs in Iraq, Mr. Ahmad finally shared that he has no legitimate experience building bombs. He based his knowledge of bomb making from wiring from working on cars.

| | |
|---|---|
| Mr. Ahmad: | Yeah, well not everybody you know like some—like, for me I work on car. I know wiring is easy for me. Some, like, people. Like, I don't know how to do haircut, right? |
| Source: | Really? |
| Mr. Ahmad: | Or I—I don't know how to bring TV back to life, you know to have the TV working. |
| UCE: | Mhmm. |
| Mr. Ahmad: | It's the hard for me or have the laptop. You know I ca—this laptop's not gonna fucking working. |
| UCE: | Yeah. |
| Mr. Ahmad: | Don't you understand? |
| UCE: | Yeah. |
| Mr. Ahmad: | I can, but bring me car, yeah I can fuck it up and fix it. You |

|  | know it's everybody about what they do.  You know, like you cook [unintelligible], I don't know how to cook. |
| UCE: | So, you're trying to say everybody there know how to make bombs? |
| Source: | Yeah. |
| UCE: | Okay. |
| Mr. Ahmad: | No, Mohamed my brother he--he go like, this, no, I don't wanna do this shit man. I don't know how to do it. He's even lazy to hold the wire. I tell you like he want, when he wanna work he want office and sit down, you know? See— |

The meeting concluded after dinner at Ra Sushi, a restaurant in the at La Encantada shopping mall in Tucson.  Prior to the recording ending, one UCE was recorded saying, "Yeah [unintelligible], yeah. We got him."

On June 27, 2017, federal and state agents carried out an "operational plan for a buy bust." The plan resulted in Border Patrol Agent Jose Madrigal conducting a traffic stop on Mr. Ahmad for following the vehicle ahead of him too closely.  The agent then "suspected" that two vehicles were driving in tandem for a specific purpose. Mr. Ahmad ultimately consented to a search of his car, after which Agent Madrigal located 49.08 grams of heroin, a meth glass pipe, and .08 grams of meth.  Mr. Ahmad was arrested and booked into the Pima County Jail.

On June 29, 2017, Detective Frank Leyva of the Pima County Sheriff's Department obtained an Arizona state search warrant in order to access Mr. Ahmad's phone.  Sheriff Deputies took it from Mr. Ahmad's car two days prior.  It was specifically located on the front passenger seat in Mr. Ahmad's vehicle.   Detective Leyva requested the warrant to further investigate Mr. Ahmad's illegal drug dealings.

## III.   Argument

Government agents violated Mr. Ahmad's due process rights because they engineered a scheme to bait him to sell them heroin, and to both provide them with a bomb recipe and to teach them to construct two explosive devices.  There is no evidence Mr.

Ahmad previously engaged in heroin trafficking, bomb building, bomb detonating, or the exportation of bomb recipes.  Therefore, because the government is unable to show that, because of Mr. Ahmad's known bomb related activities and heroin dealings, he was a preexisting danger to the community and their policing actions were merely performed to catalyze the arrest of him, their actions can be described as no less than outrageous, and the indictment must be dismissed.

## IV. Law and analysis

Outrageous government conduct occurs when the actions of law enforcement officers or informants are "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431-32 (1973). The government's conduct must be "so shocking to due process values that the indictment must be dismissed." *United States v. Williams*, 547 F.3d 1187, 1199 (9th Cir. 2008) (citation omitted).  Dismissal is "limited to extreme cases in which the government's conduct violates fundamental fairness." *United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003). Outrageousness is an "extremely high standard" that can only be met by conduct "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Hullaby*, 736 F.3d 1260, 1262 (9th Cir. 2013).

There is no bright line dictating when law enforcement conduct crosses the line between acceptable and outrageous, so "every case must be resolved on its own particular facts." *United States v. Bogart*, 783 F.2d 1428, 1438 (9th Cir. 1986), vacated in part on other grounds sub nom. *United States v. Wingender*, 790 F.2d 802 (9th Cir. 1986) (order).

In assessing the reasonableness of various law enforcement actions and tactics, however, the Ninth Circuit has set forth rules that provide guidance. For example, it is outrageous for government agents to "engineer[] and direct[] a criminal enterprise from start to finish," *Williams*, 547 F.3d at 1199 (internal quotation marks omitted), or for the government to use "excessive physical or mental coercion" to convince an individual to commit a crime, *United States v. McClelland*, 72 F.3d 717, 721 (9th Cir. 1995). It is also outrageous for the government to "generat[e] . . . new crimes merely for the sake of

pressing criminal charges." *United States v. Emmert*, 829 F.2d 805, 812 (9th Cir. 1987). It is not outrageous, however, to infiltrate a criminal organization, to approach individuals who are already involved in or contemplating a criminal act, or to provide necessary items to a conspiracy. *See United States v. So*, 755 F.2d 1350, 1353 (9th Cir. 1985). Nor is it outrageous for the government to "use 'artifice and stratagem to ferret out criminal activity.'" *Bogart*, 783 F.2d at 1438 (quoting *Sorrells v. United States*, 287 U.S. 435, 441 (1932)).

In *United States* v. *Bonanno*, 852 F.2d 889 (9th Cir. 1998), the Ninth Circuit considered five factors to find that the government's conduct in investigating white collar crimes – mail fraud, wire fraud, and conspiracy – was not so outrageous to violate due process standards. The five factors the court considered were:

1. Defendant was already involved in a continuing series of similar crimes, or the charged criminal enterprise was already in process at the time the government agent became involved;

2. The agent's participation was not necessary to enable the defendant's to continue the criminal activity;

3. The agent used artifice and stratagem to ferret out criminal activity;

4. The agent infiltrated a criminal organization; and,

5. The agent approached persons already contemplating or engaged in criminal activity.

Although the above-mentioned factors are relevant to the present analysis, the Ninth Circuit made clear, however, that the factors are not a test. Each case is to be resolved on its own particular facts with the factors as part of the consideration of all the circumstances as a whole. *United States v. Black*, 733 F.3d 294 (9th Cir. 2013).

Relying on the factors set forth above as guidance, Mr. Ahmad will show that government agents fully engineered this scheme from start until his arrest. Unlike the defendant in *Bonanno*, none of the five factors can be applied to Mr. Ahmad's case.

*a. Mr. Ahmad was not already engaged in a continuing series of similar crimes at the time government agents became involved; additionally, but for the agents' involvement, Mr. Ahmad would have never been engaged in this criminal activity.*

Mr. Ahmad was not engaged in heroin or bomb related activities prior to federal agents entering his life. Although there were allegations from source 78036, an individual that was connected with the Mexican Paisas, that Mr. Ahmad built, sold, and detonated pipe bombs at his boss's car yard, the allegations were unsubstantiated for many reasons.

First, source 78036's sketch of the pipe bomb he allegedly witnessed explode at Mr. Ahmad's place of business in July 2016 was elementary. The sketch was without detail, and source 78036's description of the pipe bomb was unhelpful – "single cord [fuse] from the side" and it was the "length of a legal pad." Did source 78036 claim that the pipe bomb was the length of the legal pad because he witnessed SA Lightfoot sitting before him taking notes on a legal pad?

Second, source 78036's description of the blast was generic – "dirt flew up", a "car moved", and source 78036 "felt pressure in his chest." The source also reportedly had a video of the blast on his phone from that day, but it was conveniently not available to show officers during each of the three plus interviews he had with them. The video has not been recovered or disclosed to this day.

Third, source 78036's information was unreliable. Source 78036 claimed that Mr. Ahmad buried the pipe bomb "a little" in the ground and underneath a car. However, footage of the car yard from August 2016, days after the alleged pipe bomb explosion occurred, shows no damage to the surrounding area. *See* Exhibit C, Google Maps image of car yard taken in August 2016. Further, when considering both Google Map images of the car yard and source 78036's allegations, it would have been impossible for the pipe bomb to be "buried a little" in the ground because the supposed detonation site is actually a slab of concrete, and not loose dirt as source 78036 stated. *Compare* Exhibit D, Google Maps aerial image of car yard, *with* Exhibit E, image of car yard from government disclosure with source 78036 highlighting detonation site.

Moreover, source 78036's claim that he and the others present that day were 40 yards from the detonation site is impossible. The entire width of the car yard is less than 40 yards. Measuring the distance from where source 78036 stood at the time of the detonation to the alleged detonation site reveals that, if true, he was 15 yards away from the detonation site. *See* Exhibit D, Google Maps aerial image of car yard. That distinction – 40 yards versus 15 yards – is very recognizable. It is almost the difference between half of an American football field versus the length required under American football rules to achieve a first down – 10 yards. Lastly, and regarding the allegation that Mr. Ahmad sold five pipe bombs to "Rafa" and other "Mexicans," source 78036 could not even say for certain that he witnessed the transaction take place. According to government reports, source 78036 was quoted saying, "it was his understanding" that Mr. Ahmad sold five similar pipe bombs.

Ultimately, the investigation into Mr. Ahmad was predicated on unreliable and generic information.

Additionally, over the course of the government's investigation, local and federal agents made multiple trips to Mr. Ahmad's place of business, but never reported they had seen bomb-making materials stored on site or a bomb detonation site on the property. In fact, after someone burglarized Mr. Ahmad's yard in late November 2016, local law enforcement visited Mr. Ahmad's yard on multiple occasions, and they never once reported concerns over bombs or drugs. Additionally, Mr. Ahmad's yard is only a few miles from the Tucson International Airport and a stone's throw away from Davis-Monthan Air Force Base. Neither federally guarded facilities reported security concerns coming from Mr. Ahmad's yard or the general area.

The government also conducted aerial surveillance on Mr. Ahmad's place of business on multiple occasions and prior to Mr. Ahmad ever speaking with government sources about constructing a bomb or dealing heroin. Aerial surveillance never showed that Mr. Ahmad, or anyone affiliated to him, built or detonated bombs on the property. There is also no visual evidenced of Mr. Ahmad using the property to distribute drugs.

Then, on October 12, 2016, thirteen days after source 78036 last met with agents, the Pima County Sheriff's Department reported to Mr. Ahmad's place of business after unknown flashes were seen on the Mr. Ahmad's yard. After law enforcement's arrival, and after they walked the grounds of the car yard, they never came across bomb making materials, a bomb detonation site, or a drug dealing site; instead, they found flashes from contained fires that Mr. Ahmad and his brother constructed around their job site to keep mosquitos away while they performed mechanic work through the night. The sheriff's deputies left the car yard without incident.

Regarding bomb building, generally, and knowledge thereof, there is no evidence Mr. Ahmad was previously engaged in the building, selling, or detonating of explosive devices after legally entering the United States. The government learned during their investigation that Mr. Ahmad had no experience in this field. He was a mechanic with knowledge of electric circuitry methods, and he confessed this to them:

Mr. Ahmad: Yeah, well not everybody you know like some--like, for me I work on car. I know wiring is easy for me. Some, like, people, like, I don't know how to do haircut, right.

Source: Really?

Mr. Ahmad: Or I--I don't know how to bring TV back to life, you know to have the TV working.

UCE: Mhmm.

Mr. Ahmad: It's the hard for me or have the laptop. You know I ca--this laptop's not gonna fucking working.

Mr. Ahmad had no idea about what he was doing, and this was especially true with regard to building a device with a laptop: "…this laptop's not gonna fucking working." (Mr. Ahmad was recorded stating this).

As early as December 22, 2016, agents were aware that Mr. Ahmad's knowledge of bomb building was nothing more than elementary – he knew how to put gasoline in a metal bucket and shoot at it. And, on one specific occasion when agents asked Mr. Ahmad about detonating a bomb using a cell phone, Mr. Ahmad replied, "You know what? Just go to

Google. Google it. And they give you instruction how to make a bomb. Come on." Mr. Ahmad did not have knowledge on hand on how to construct a bomb.

The agents, nevertheless, engaged with Mr. Ahmad until they formed a friendship with him. They showed him their sense of gratitude and friendliness with payment in the form of either money, food, or drinks. In approximately 40 of the 47 occasions that agents and Mr. Ahmad met, it was the agents, and not Mr. Ahmad, that initiated that contact. The agents appeared almost daily and at random hours at Mr. Ahmad's place of business. And, on some of those occasions, Mr. Ahmad either arrived late because he was not expecting them, or because he did not arrive at all because he was not expecting them. Ultimately, 85% of the meetings that took place during the investigation were because the agents went to Mr. Ahmad, not that Mr. Ahmad went looking for the agents to fulfill preconceived plans.

During the numerous times that agents met with Mr. Ahmad, they were aggressive about recruiting him to build a bomb. On March 4, 2017, sources 18438 and 79045 engaged in conversation before arriving at Mr. Ahmad's place of business, and they were recorded saying, "I'm – we're going to [unintelligible] the fucking shit with a bomb, too." This behind the scenes recorded conversation outside of Mr. Ahmad's presence made the agents' motivations clear – Mr. Ahmad was going to give them a bomb.[9]

This aggressive behavior is evident in the agents' conversations with Mr. Ahmad. For example, on February 27, 2017, source 18438 relentlessly tried to engage Mr. Ahmad

---

[9] Source 18438 informed the news source USA Today that the government gave him authority to "sculpt operations":

> The Informant boasted about his work in another case in which suspected violent criminals allegedly took part in a conspiracy that was actually a ruse orchestrated by the FBI. The details of the case illustrate how much discretion The Informant has to sculpt operations, indictments and even potential prison sentences. Testimony in that case showed that The Informant picked and lured his own criminal targets and conceived of much of the imaginary crime they allegedly took part in.

*Confidential informants are supposed to keep their work confidential. These two didn't*, *supra* note 6.

in conversation about building a bomb. Source 18438 told Mr. Ahmad on multiple occasions that he felt stupid because he failed to detonate a bucket filled with gasoline in front of his peers in Mexico. Finally, source 18438 tried to get Mr. Ahmad to engage, "How much you charge me if I know how to do that one?" Source 18438 set the stage to convince Mr. Ahmad to build him a bomb in exchange for payment.

Source 18438's aggressiveness persisted for weeks on end. And, despite Mr. Ahmad telling source 18438 he, "…don't wanna do this bullshit (build a bomb)," and, "—you known, I don't wanna end up in Guantanamo," source 18438 would not let Mr. Ahmad discontinue the conversation until he agreed to participate in source 18438's bomb making plans. Source 18438 persistently asked Mr. Ahmad more bomb related questions to keep him interested. The list below illustrates the questions source 18438 would force onto Mr. Ahmad:

- "But what else can I use to—to—to make the spark?"
- "To see explode—dynamite or no?"
- "Why did you show me how to hook up the phone? No, no, no, but if I bring the phone here, you show me how to do it."
- "No, but how much you charge me, you come help him or just make one for me."
- "But how do you [unintelligible] the cable? Do I put 'em with a [unintelligible}?"
- "That's it?"

Source 18438 needlessly pushed Mr. Ahmad to answer his questions: "Say, but these ones, like, if we put, like from here to that corner, I just [unintelligible]."

In an additional effort to get Mr. Ahmad to commit to his bomb-building plan, source 18438 tried to persuade Mr. Ahmad with money. At first, source 18438 wanted to split the bomb building proceeds 50-50; however, after Mr. Ahmad was still visibly hesitant to accept source 18438's proposition, source 18438 immediately changed his tone: "Hey so, four thousand, you keep three, I keep one. And then um, will you get, you get the phone and everything." Mr. Ahmad never agreed to a price during that conversation because he was unsure about going through with source 18438's plan.

Mr. Ahmad never committed to joining the agents in Las Vegas until the last minute, and, although that does not negate the fact that he travelled to Las Vegas, it shows he was uninterested in the agents' plan because it was their plan, not his. He had no vested interest in showing people how to build bombs or in committing bomb attacks. In fact, at first, Mr. Ahmad did not even feel comfortable building a device in the United States. He told source 18438 he would show him how to build a device in Mexico and only "...if you have the phone and wire and everything." Then, right after stating that, Mr. Ahmad balked and again tried to back out of source 18438's plan to go to Mexico because he was on probation: "You know, I-I can show you do it over there. For me, I-uh-I mean but I can't cross, but I'm on probation, I can't go and do it over there, you know." But, the agents persisted:

Source:  You're gonna show me how to put the thing together.

Mr. Ahmad:  I show you here in Tucson?

Source:  No! [UI]! I don't—I wanna make sure it works!

The agents even procured a private plane to show Mr. Ahmad that traveling to Las Vegas would be safe, easy, and achievable while he was on probation. Still, that information did not convince Mr. Ahmad:

Mr. Ahmad:  I just don't wanna get in trouble though, bro.

Source:  No! No, no. it's fine.

Mr. Ahmad:  Y-y-you feel what I'm saying?

Source:  Yeah I know.

Mr. Ahmad:  Not even by the government or by whatever, y'know?

Source:  Yeah.

Mr. Ahmad:  I don't wanna be in trouble, that why I like, I want to do—I-
I.

The statements recorded above were not the only time Mr. Ahmad hesitated to accept the agents' plans. As shown in the fact section, Mr. Ahmad balked at the idea of joining them in Las Vegas on at least four occasions – April 11, 2017; April 13, 2017; April 16, 2017; and, April 21, 2017. Due to Mr. Ahmad's unwillingness to commit to the agents' plans, source 18438 asked Mr. Ahmad to show him how to construct the bomb:

| | |
|---|---|
| Source: | Well you show me? |
| Mr. Ahmad: | I do this, y'know, it's for you. Y'know, that me and you. |
| Source: | Yeah. |
| Mr. Ahmad: | That's why—you remember when the stuff come and get it out? |
| Source: | Yeah. |
| Mr. Ahmad: | It's just me and you, I don't deal with someone else. |

Source 18438 ultimately had to rely on his friendship with Mr. Ahmad to get him to commit to an act that was, at the very least, sufficient to charge him with a federal offense since that was the agents' goal from the outset.

Moreover, once Mr. Ahmad traveled to Las Vegas, the agents facilitated the construction of the bomb by providing Mr. Ahmad with the following:

- 2 Avital 5305L car alarms
- 2 Duralast 12V AHM motorcycle batteries
- 1 pair of wire cutters/strippers
- 1 digital multimeter
- 1, 1000 piece assortment of wire ties
- 2 rolls of duct tape
- 1 mini screwdriver set
- 2 solder rolls
- 1, 6 pack hot glue sticks
- 1 hot glue gun
- 1 soldering station
- 1 connector kit
- 24 butt connectors
- 8 ring terminals;
- 20 inch and 10 inch red and black wires
- 24 cable ties;
- Suitcase

- Backpack
- Gloves
- Blasting caps to detonate the bomb
- C-4 explosives (inert)

The list above is comprehensive, whereas the items Mr. Ahmad brought to Las Vegas was minimal, and that was how UCE 7581 planned it – "Yeah, double check with me cause I wanna make sure we got the price, all the stuff we need, and then um the date when we can go when you're [UI]." Mr. Ahmad brought a pocketknife, a spool of wires, a power circuit tester, and epoxy. Later, Mr. Ahmad purchased a less sophisticated car alarm at Frye's Electronics in Las Vegas with the agents; however, he did this only after he and the agents recognized that the car alarm the agents initially bought would not work.

Ultimately, Mr. Ahmad was never involved in a continuing series of similar crimes; additionally, there was no charged criminal enterprise already in process at the time the government agents became involved. And, but for the agents' involvement in this case, Mr. Ahmad would have never engaged in the criminal activities the government accuses him of committing.

This case is uniquely similar to *United States v. Lard*, 734 F.2d 1290 (8th Cir. 1984). In *Lard*, two undercover government agents made friends with the co-defendant, Rigsby, after a source introduced them. *Id.* at 1292. On one evening, after agents took Rigsby out for drinks, the two agents asked Rigsby if he knew anyone who had guns for sale. *Id.* Rigsby led the agents to Lard. *Id.*

Lard and the agents first discussed legally acquiring guns and a bomb detonator. *Id.* Then, either Rigsby or the agents mentioned the idea of using a pipe bomb. *Id.* A government agent then implored Lard that he really needed a pipe bomb to blow up a car. *Id.* at 1294. Lard initially resisted this solicitation and asked if he could just sell him the bomb detonator, but the agent continued to request a pipe bomb. Eventually, Lard agreed to build the pipe bomb for $100. *Id.*

Three hours later, Rigsby and one agent returned to Lard's apartment to retrieve the pipe bomb. *Id.* at 1292. Upon their arrival, Lard promptly explained the bomb's

39

specifications and stated that the bomb could be attached to a car's radio, hot wire, engine coil, or gasoline tank. *Id.* The pipe bomb was built using nails, shotgun powder, primer caps, and an electric blasting cap, and, it was viable. *Id.* Lard and Rigsby were arrested, as a result. *Id.*

Rigsby and Lard were convicted after trial. *Id.* at 1298. However, the Eighth Circuit Court of Appeals reversed the judgements. *Id.* The court found, *inter alia*, that, "apart from the entrapment defense, Agent Anderson's overinvolvement [sic] in conceiving and contriving the crimes here approached being so outrageous that due process principles should bar the government from invoking judicial processes to obtain a conviction." *Id.* at 1296. The court wrote:

> Anderson's conduct was not aimed at facilitating discovery or suppression of ongoing illicit dealings in unregistered firearms. Rather, it was aimed at creating new crimes for the sake of bringing criminal charges against Lard, who, before being induced, was lawfully and peacefully minding his own affairs. *See United States v. Twigg*, 588 F.2d at 381. The government agents' overzealous efforts to instigate crime also involved rather extreme and questionable measures -- including the smoking of marijuana -- to gain Lard's confidence and lure him into committing a crime he was not otherwise ready and willing to commit. Concepts of fundamental fairness preclude us from putting our imprimatur on law enforcement overreaching conduct designed to instigate "a criminal act by persons 'otherwise innocent in order to lure them to its commission and to punish them.'" *Russell*, 411 U.S. at 428-29, quoting *Sorrels v. United States*, 287 U.S. at 448.

*Id.*

This Court should look to the Eighth Circuit's persuasive opinion in *Lard* to find that the agents' practices crossed the line when they lured Mr. Ahmad and "then implanted a law-breaking disposition that was not theretofore present." *Id.* at 1296.

Here, a "potential confidential human source" led agents to Mr. Ahmad just as Rigsby brought agents to Lard. *Id.* at 1295. Within a month of meeting the agents, Mr. Ahmad told them he knew how to make bombs by shooting at a bucket filled with gasoline, a commonly known combustible liquid. He also told agents he heard of bombs detonated by cellphones in Iraq. As shown in the fact section, Mr. Ahmad brought up these points in

passing, not because he was "eagerly awaiting a propitious opportunity to ply his trade for financial gain." *Id.*

The agents, however, wanted more than stories of Mr. Ahmad's childhood in Iraq and his understanding that bombs could be detonated using a phone or be built using a bucket and gasoline, and so they implored him, similar to how the agents implored Lard, to construct an explosive device. As mentioned previously, it was the agents that were recorded saying here, "I'm – we're going to [unintelligible] the fucking shit with a bomb, too," and then, over the course of many, many meetings at Mr. Ahmad's place of business (approximately 40 out of the 47 meetings between Mr. Ahmad and the agents took place at Mr. Ahmad's place of business) they pressed him to construct a bomb capable of being detonated by a cellphone or laptop.

As in both *Lard* and in the present case, the surrounding circumstances did not support the government's implication that either Mr. Ahmad or Lard developed an expertise in making bombs and "eagerly awaited a propitious opportunity to ply their trade for financial gain." *Id.* at 1297. In fact, initially, Lard balked at the idea of constructing and selling the agent a pipe bomb similar to how Mr. Ahmad hesitated to accept the agents' plans to go to Las Vegas on at least four occasions. It was, nevertheless, the agents gifting of money and food, and their overly friendly behaviors to Mr. Ahmad that "lure[d] him into committing a crime he was not otherwise ready and willing to commit." *Id.*

Only one fact distinguishes the present case from *Lard*: Lard's case occurred over the course of one evening, whereas here agents built a relationship with Mr. Ahmad over the course of several months, and then, when they were ready, took him to another state and provided him with most of the items necessary to construct a bomb. This distinguishing fact makes this case even more egregious than *Lard*.

Lastly, and most importantly, **the agents never approached Mr. Ahmad about constructing them a pipe bomb, on which they predicated their entire investigation. The agents lured Mr. Ahmad into building an entirely different destructive device.** There may have been many reasons for this, including that agents did not find source 78036's information about the building, selling, and detonating pipe bombs at Mr.

41

Ahmad's place of business reliable. Nevertheless, this fact demonstrates that the agents implanted the criminal design through improper solicitations and inducements exactly as they had done in *Lard*. The Eighth Circuit found this behavior outrageous. This Court should do the same.

      *b. Government agents did not infiltrate a major criminal organization.*

When government sources made contact with Mr. Ahmad, they did not infiltrate a major organized crime syndicate. They made friends with a street hustling mechanic with a methamphetamine addiction. Mr. Ahmad completed drug transactions not because he had a profitable drug distribution business, but because the sources asked him for heroin, and he could get it from his work neighbor, Pancho, who imported heroin directly from Mexico. At one point, source 18438 reported that, at Pancho's directive, young female body carriers transported Pancho's heroin from Mexico into the United States: "Pancho LNU (last name unknown) stated he has an attractive 18 year old female smuggle the heroin from Nogales, Mexico to Tucson, AZ. Once the female enters the United States, from Mexico, the female takes a shuttle to Tucson, AZ." Despite learning these facts, agents were still interested in Mr. Ahmad, a methamphetamine addict that had no history of using or selling heroin.

Mr. Ahmad was also not in control of Pancho's prices, the quantity of heroin available at a given time, or when the heroin would be available for source 18438 to purchase, and this was again proven on February 27, 2017, when source 18438 unexpectedly showed up at Mr. Ahmad's place of business to request heroin from him. Initially, Mr. Ahmad did not expect source 18438 to come by his car yard and was not present. But, sources 18438 and 79045 waited for over 30 minutes for his arrival. At one point, the sources were recorded telling Mr. Ahmad's brother, "How long 'til he's fuckin' here?" and "Tell him right away or I leave." The agents wanted Mr. Ahmad, and not Pancho, to deliver them the heroin.

When Mr. Ahmad arrived to his car yard, he did not have the heroin available for the agents. He was unaware of how much heroin Pancho had available, or the price of Pancho's heroin. However, once Mr. Ahmad assumed a role as intermediary, he returned

to source 18438 with answers from Pancho.  Recognizing Mr. Ahmad was a middleman and had no decision making authority, source 18438 said, "Oh yes, I don't want to get involved, so it's ten [unintelligible].  So, three hundred is yours."  Source 18438 did not have the power to negotiate prices with Mr. Ahmad because everything came from Pancho.

On March 7, 2017, source 18438 again learned that it was Pancho, and not Mr. Ahmad, that dictated heroin prices and the quantities available.  On that date, source 18438 asked Mr. Ahmad for heroin, but, when Mr. Ahmad could not secure the heroin from Pancho, the following was said:

Source: Oh. Hey, should I come back later or what do you think?

Mr. Ahmad: Let me call you—let me—let me talk to Pancho and see.

Source: I thought he'd have it by now, you know? And I went to pick
up the money [unintelligible], you know.

It was obvious Mr. Ahmad was solely an intermediary between the agents and Pancho.

Then, on March 10, 2017, it was government agents alone that planned for a drug deal to take place at Mr. Ahmad's place of business.  Mr. Ahmad had no details about when the drug deal would take place, the number of people arriving, or the type or quantity of drugs involved.  All he knew was that he would be paid for renting out his space for that brief period of time.  Nevertheless, and importantly, without the agents, none of this would have transpired.  And, their actions in coordinating this controlled drug deal are representative of their actions as a whole in infiltrating Mr. Ahmad's life to manipulate him to become, as the agents referred to him, "like a consultant" to their organization. Mr. Ahmad, however, was never part of criminal enterprise before the agents infiltrated his life and dubbed him with that title.

### c. The agents used artifice and stratagem to convince Mr. Ahmad to engage in illegal activities at their direction.

Using money, gifts, and friendliness, agents employed a scheme to lure Mr. Ahmad into committing illegal acts at their direction.[10] The following is a non-inclusive list of the items Mr. Ahmad received from the agents:

- $100 down payment for a Ford engine never purchased
- A promise to purchase a car battery charger for the car yard
- $55 in cash to purchase gas
- $300 bonus for arranging the heroin purchase with Pancho
- $25 cash
- $50 to Mr. Ahmad's brother;
- $1,000 to use the car yard to conduct the controlled drug deal
- A cooler full of food and drinks
- Numerous outings to steak and sushi restaurants and bars

Penniless and drug addicted, Mr. Ahmad was led to believe agents considered him family. On numerous occasions, the sources would tell Mr. Ahmad they loved him. That was a big deal for Mr. Ahmad since he lost his father at a young age, and because, to him, it was culturally unacceptable to speak like that to men outside of the family. A typical conversation between source 18438 and Mr. Ahmad would end in the following fashion:

Source:          I'll give you a call.

Mr. Ahmad:  Alright, buddy.

Source:          Thank you [unintelligible].

Mr. Ahmad:  Thank you for –

Source:          I love you.

Mr. Ahmad:  I love you, too.

---

[10]According to  USA Today, source 18438 manipulated Mr. Ahmad into acting at his direction because, the longer he kept the government interested in Mr. Ahmad, the more the government paid him: "I'm not a [expletive] hero . . . I'm getting paid." *Confidential informants are supposed to keep their work confidential. These two didn't, supra note 6.*

The agents were also recorded telling Mr. Ahmad, "You know, I love you," and, "I lo— love hanging out with you." This offer for friendship was important to the agents' bomb-making scheme because they knew it was one way to get Mr. Ahmad to construct a bomb for them since he had no prior bomb building experience: "Okay. No, I-I believe you and I know you can probably make it. But since this is something your first time doing it, I want something that you feel comfortable that's gonna work. And if you need C-4, I'm okay getting C-4 for you, I don't mind paying the money." – UCE 7581.

Mr. Ahmad was drug addicted and broke, and he most likely suffers from serious mental health issues because he experienced war and bloodshed at a young age in Iraq. As such, friendship and small amounts of money were life changing to him. Lastly, federal agents had to rely on artifice and stratagem to achieve their investigative goals because they knew local law enforcement previously "…attempted their own undercover activity without success."

**V.    Conclusion**

The government's investigative conduct was outrageous, and it violated Mr. Ahmad's Fifth Amendment right to due process. As such, this Court should dismiss the indictment against him.

In the exceptional case that the Court does not find that Mr. Ahmad's due process rights were violated, the Court "may exercise its supervisory powers to dismiss an indictment in response to outrageous government conduct that falls short of a due process violation." *United States v. Ross*, 372 F.3d 1097, 1109 (9th Cir. 2004). This is a viable option because the government's actions were flagrant and caused 'substantial prejudice' to Mr. Ahmad. *Id.* at 1110.