MICHAEL BAILEY
United States Attorney
District of Arizona
ERICA L. SEGER
Assistant U.S. Attorney
State Bar No. 022681
405 W. Congress St., Suite 4800
Tucson, AZ 85701-5040
Tel. (520) 620-7300
Email: erica.seger@usdoj.gov
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| United States of America, | CR 18-02417-TUC-RCC |
|---|---|
| Plaintiffs, | GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT (ECF DOC. 105) |
| v. | |
| Ahmad Suhad Ahmad, | |
| Defendant(s). | |

Plaintiff, the United States of America, by and through its attorneys respectfully responds to the defendant's motion to dismiss for outrageous conduct. (ECF Doc. 105.) Because the defendant's claims fall far short of the standard the Ninth Circuit set in *Black*, his motion to dismiss should be denied. The defendant, whom agents learned was involved in making and selling pipe bombs, independently planned and executed important portions of the crime, and was an enthusiastic participant in the venture.

## I. FACTS

In July 2016, the FBI received information that the defendant was building, selling and detonating pipe bombs in an auto/junk yard (Lot 22) he and his brother operated in Tucson. The FBI was ultimately provided a sketch of a pipe bomb type device that was observed at Lot 22 along with a description of its effects and damage following the detonation of one of the pipe bombs on the property sometime around July 4, 2016.

According to the reporting source, the twelve-inch white PVC pipe bomb was detonated under a medical transport Crown Victoria. Bomb technicians from both the FBI and Pima County interviewed the source of information about his observations and experiences at Lot 22 when the defendant detonated devices. Both technicians believed that the witness was present when a bomb was detonated based on his description of the device and the effects he described. As a result of this information, the FBI began an investigation.

Confidential human sources (CHS) were introduced to the defendant and his brother, Mohammed, in November 2016. The CHS' successfully presented themselves to the defendant as having interest and expertise in automobiles/mechanics. The defendant grew to trust one of the CHSs and appeared to consider him his friend with each passing meeting at Lot 22.

On November 16, 2016, a CHS visited Lot 22. While at the defendant's shop, the defendant showed the CHS a long gun and a handgun as well as what he claimed was a couple of ounces of crystal methamphetamine. (Attach. A.) The defendant informed the CHS that, if the CHS was interested he could get the CHS two pounds of crystal methamphetamine with just a phone call. (*Id.*) The defendant asked the CHS if the CHS could acquire or knew someone who could sell him a rocket propelled grenade launcher as well as a small AK 47 and a 14 caliber long gun. (*Id.*)

On December 1, 2016, the CHS inquired about buying a Ford engine for $600 and using the engine or parts for his vehicle. The defendant indicated he would allow the CHS to utilize his tools and his shop if the CHS purchased the Ford engine. The CHS asked if he (Ahmad) could make a car radiator wider so the CHS could transport money and the defendant agreed that he could make the radiator wider.

On December 16, 2016, the defendant was indicted in the Pima County Superior Court on charges related to methamphetamine possession on November 26, 2016. On November 26, the defendant was observed by law enforcement as the driver of a vehicle that discharged a BB gun at another vehicle. After being pulled over, while searching for the airsoft rifle, the officers located methamphetamine in the driver's side door and a 40-

caliber handgun. The defendant ultimately pleaded guilty to solicitation to possess methamphetamine and possession of drug paraphernalia and was sentenced to eighteen (18) months' probation starting April 12, 2017.

On December 3, 2016, the CHS and defendant discussed various firearms. (Attach. B.) The defendant talked about firearms he had that were taken by the police because of his arrest and placement on probation. (*Id.*) The defendant indicated that he purchased a shotgun for two ounces of marijuana and that the CHS could buy a bazooka for the amount of money he spent on a different firearm. (*Id*.)

On December 7, 2016, the CHS, defendant (AA) and an unidentified male (UM) discussed various prices of cocaine. (Attach. C.)

AA:    But I--my--my friends, they will always ask me, my guys coming-- do you sell it to me.

CHS:    So--but you'll pay fifty bucks?

AA:    Mhmm.

CHS:    Really?

AA:    I swear. [UI], how much I pay for eight ball coke? For eight ball coke, how much?

AA:    No, what's Mohammed buy for?

UM:    Fifty-five?

CHS:    I gotta see what's--I gotta try [UI]

AA:    It's alright, sometime, I get drunk, you know? Fifteen minutes. Go to sleep.

CHS:    So, how much is a half an ounce?

AA:    Like, six hundred?

CHS:    Maybe I do business with you.

AA:    I was telling you--I don't-- If I want--when I sometimes party with something, I pay for my--mine--one fifty.

CHS:    For an a--for an ounce?

AA:    An eight ball.

CHS:  An eight ball.

AA:    Yeah. That's--that's when I wanna buy. I wanna spend money.

CHS:  But it's good.

AA:    Well, that shit lasts me for two weeks, three weeks.

CHS:  So, how much you giving to me? One--one fifty?

AA:    Huh?

CHS:  One fifty?

AA:    Well, if you want. How much you want?

CHS:  Well, let me try.

AA:    No. If you want--want some good stuff, I get you--

CHS:  Pay one fifty?

AA:    No. Cheaper. I get you some good stuff cheaper.

On December 15, 2016, the defendant told the CHS that he would be trading a Toyota Corolla sedan for a Mini-14 Ruger .223 caliber rifle and showed the CHS a photograph of the Mini-14 which he had on his cellular phone. When the CHS noted that the photograph of the Mini-14 Ruger had a scope attached to it, the defendant bragged that, with this weapon, he could shoot someone from far away and no one would see him.

On December 17, 2016, the defendant began talking about building a bomb with the CHS.  (Attach. D.)  Prior to mentioning the bomb, there was a discussion about his purchasing a fully automatic AK-47 for $500 and modifying the barrel length and color.

CHS:   So you're gonna pay 500 huh?

AA:    A bomb—a bomb is easy to make.

CHS:  Really?

AA:    Yeah.

CHS:  But what do you need?

AA:    You don't need nothing, just need like, two, uh—uh, four bottle, forty Corona.

4

The conversation continues with the defendant providing more information about how to build a particular bomb using a bucket, his experiences building and detonating a similar bomb in Iraq and how they will continue their conversation when no one else is present. (*Id.*)

On December 22, 2016, the CHS and defendant had a conversation about the defendant's life in Iraq. (Attach. E.) The defendant talked about how American soldiers would be killed at checkpoints by cell phone bombs strapped to donkeys. (*Id.*) He described how to construct the bomb, how it detonates, how to wire the bomb, and other details. (*Id.*) He later told the CHS to wear a disguise to conceal his identity in order to use a computer at a library to google a bomb recipe. (*Id.*)

On January 2, 2017, the defendant and CHS discussed the CHS taking the defendant's gun (a broken .40 caliber Ruger handgun) to Mexico to be fixed. (Attach. F.) Later during the conversation, the defendant indicated he wanted to buy cocaine from the CHS.

AA : Mhmm [UI] What are you gonna do? [UI]

CHS: Probably like cocaine.

AA: Cocaine? How much for an ounce? Can you push it? I won't say no.

CHS: [UI]

AA: I, I want some right now. I have the money.

CHS: Well, people sell by kilos.

AA: By kilos [UI] then tell your, your, your friend over there [UI] to sell it to me [UI]. [OV]

CHS: [UI] Really? [OV]

AA: [UI] from Ohio. Yeah, [UI] He my neighbor before [UI]. [OV]

CHS: Un-hun.

AA: And we talk by Snapchat. Tell him we need ounce now. [UI] Need ounce now if you have it. We have the cash for it, but we want the pure shit.

During the same conversation, the defendant asked the CHS if he wanted to buy an AK rifle and pistol. (*Id*.)

On January 30, 2017, the CHS returned the broken .40 caliber Ruger handgun to the defendant at his shop. (Attach. G.) Although the initial discussion was about politics, the conversation changed to drugs – specifically heroin. (*Id*.) The defendant indicated that his friend wanted to sell the heroin and proceeded to negotiate a price with the CHS - $50 per gram. (*Id*.) The defendant indicated he got the heroin from a friend who owed him money and that another guy was coming to purchase the heroin, but he'd rather sell it to the CHS because he liked him. (*Id*.) The heroin was wrapped in foil and the defendant stated the heroin was pure and had been smuggled into the United States from Mexico by a female.

On February 1, 2017, the defendant and his brother volunteered that they had access to white heroin and that they had contacts in Sinaloa, Mexico who were involved in the production of the drug. (Attach. H.) According to the brothers, their heroin sources of supply were Middle Eastern Nationals. (*Id.*)

On February 8, 2017, the defendant and CHS discussed using Lot 22 for offloading drugs from vehicles at a future date. (Attach. I.) During the conversation, the defendant commented he (Ahmad) had sold 200 grams of heroin the prior week. During this visit, the defendant asked the CHS for gas money; the CHS gave him $55.

On February 11, 2017, the defendant asked the CHS if he/she was interested in purchasing "negra," referring to heroin. (Attach. I.) The defendant advised he could sell the CHS the heroin for $35 a gram and stated he had 45 grams of it available. (*Id.*)

On February 15, 2017, the defendant and CHS were again discussing politics when the CHS asked if the defendant could get heroin for $35 a gram or less. (Attach. J.) The defendant told the CHS that he already bought 30 grams and could sell it for "65 each gram." (*Id*.) They continue to discuss drug sales and prices with the defendant requesting a "commission." (*Id*.) The defendant said he would ask his neighbor about quantity and pricing and that he would need the cash to buy the heroin.

The defendant mentioned that he had recently sold and mailed 15 grams of heroin to a customer in New York for $50 per gram. (*Id*.) The defendant later told the CHS how he smuggled weed to Michigan and that he wanted to buy a medical marijuana card before the conversation returned to the CHS buying 100 grams of heroin for $30 per gram.[1] (*Id*.)

On February 16, 2017, the CHS told Ahmad that he was traveling to Mexico and would have the money to purchase the heroin after he returned. (Attach. K.) The CHS said he wanted to buy 100 grams. (*Id*.) The defendant replied that the price would be $35 per gram. (*Id*.)

On February 27, 2017, the CHS initially spoke with the defendant's brother. The CHS indicated he had "thirty five hundred" to which the defendant's brother indicated it was "for the shit" and the CHS confirmed it was for the heroin. (Attach. L.) The defendant arrived and the CHS and defendant negotiated the heroin sale, as the amounts and price were not what had previously been agreed upon. (*Id*.) The CHS observed the defendant get into a Nissan Xterra and drive next door and speak to his neighbor. The defendant then called the CHS and asked him to drive outside of the shop to meet him. The CHS pulled his vehicle next to the Nissan Xterra, exited his vehicle and entered the Nissan Xterra. The defendant then sold the CHS 46 grams of a dark substance believed to be heroin for $1600 before he separated the money and kept $300 for himself.

After the heroin transaction, the defendant and the CHS discussed how to make a bomb and using Lot 22 to offload drugs between vehicles. The two also discussed future transactions after the defendant asked "You want more?" (*Id*.) After the sale, the CHS asked the defendant about renting the shop to facilitate the drug exchange between vehicles as the CHS' boss was going to be in town. (*Id*.) The conversation then shifted to the CHS talking about how he unsuccessfully tried to build the bomb as described by the defendant on December 22. (*Id*.) The defendant explained how the CHS needed to use a grenade, that it would not explode with an AK and suggested that maybe they would

---

[1] On October 14, 2016, the defendant posted on his Facebook indicating he was in Dearborn, Michigan.

want him (the defendant) to travel to Mexico. (*Id.*) The defendant ultimately told the CHS that he would teach him for free and would bring instructions the following day. (*Id.*)

On March 1, 2017, the CHS told the defendant that he sold the heroin for $90 - $100 per gram in Denver. When discussing another heroin transaction involving his neighbor, the defendant said, "I told him you were coming so I need some more." On March 4, 2017, CHS asked Mohammed to tell the defendant he wanted 100 grams at a better price. Mohammed asked to make money from the transaction before calling the defendant to let him know that the CHS needed 100 grams.

On March 6, 2017, the CHS and defendant met at Lot 22. The defendant told the CHS that his heroin supplier had already sold the 100 grams of heroin which CHS was going to purchase. (Attach. M.) The defendant advised that he knows other heroin suppliers but that these suppliers would want the money for the heroin upfront. (*Id.*) The defendant suggested it would be best if the CHS just waited for his heroin supplier to obtain more heroin. (*Id.*)

On March 7, 2017, the defendant and CHS spoke again about the neighbor selling him drugs. (Attach. N.) While the CHS was at Lot 22, the defendant left the property and came back to let the CHS know his neighbor had already sold the drugs The conversation switched to using the shop on Lot 22 for about 45 minutes to an hour to load drugs from one vehicle to another on the following Friday. The defendant and CHS negotiated the price of $1200 out of which the defendant would pay the CHS $200. When pressed for details, the CHS told the defendant they would be transferring "weed" between the vehicles. The defendant then responded, "weed I'll do for free." The defendant and CHS then discussed types of rounds for an AK-47 weapon.

On March 10, 2017, the CHS and the Mexican drug smuggler met with the defendant at Lot 22 to discuss the terms of the vehicle load swap. The defendant and drug smuggler agreed to rent out his space for a few hours for $1000. The defendant admitted to previously renting his space out to a marijuana supplier to offload 400 pounds of

marijuana from a cement truck. The defendant suggested that Fridays would be the best day of the week for this activity since most of his clients go to the mosque to pray. The defendant then asked for more details of the operation, including number of vehicles and type of drugs. The defendant also stated he wanted to go into business with the drug smuggler.

On March 15, 2017, the CHS informed the defendant they would be offloading drugs from the vehicles on the following Friday, but the defendant questioned why they could not do it sooner since the Lot 22 owner was away in Flagstaff. The defendant insisted on being present when the drugs were offloaded and agreed to give the CHS $200 as payment. The CHS told the defendant that his instructions to build the bucket bomb did not work for his guys in Mexico. The defendant explained how they should have used a metal, not plastic bucket.

On March 17, 2017, the CHS told the defendant that they were ready to use the shop on Friday, March 24. The CHS explained that three or four cars would be there for about forty-five minutes. At that meeting, in order to demonstrate his knowledge of building and detonating a homemade bomb, the defendant described when growing up in Iraq, how he learned to make a bomb that he used to kill pigeons. The defendant said he would teach the CHS how to make this same type of bomb. (Attach. O.)

On March 24, 2017, the defendant and CHS initially discussed how to split the money after offloading the drugs ($900 for the defendant and $100 for the CHS). The defendant then directed the CHS where the vehicles should pull in and park on the property. In response to a question from the CHS about when the defendant was going to show him to kill the pigeons, the defendant described in detail how to build a bomb in a metal bucket. (Attach. P.) He also explained how to build a bomb that will destroy a car (and kill any occupants) using a six or nine volt battery. (*Id.*) The defendant indicated that this type of bomb "it's going to cost you a lot, bro." (*Id.*) The CHS asked the defendant to teach him how to make a phone activated bomb so he "can teach these fuckers." The defendant responded, jokingly, "I am just being a good person. I don't

want to do this bullshit" before providing details on wiring for a cell phone activated bomb followed by, "I don't want to charge you because I'll be a criminal." "I'll do it for free." Multiple vehicles then arrived to conduct the vehicle load swap. Once concluded, the participants showed each other different weapons and called the defendant over to look at the weapons. After their weapons discussion, the defendant was paid $1000.

Multiple individuals then followed the defendant over to another property in town that the defendant was considering renting. During that trip, the defendant and the CHS discussed making a bomb to kill a Mexican Commandante for the drug smuggling organization.

On March 30, 2017, the CHS asked to meet at the defendant's residence the following Tuesday. The CHS then explained how his boss wanted to kill a guy in Mexico using a car bomb. "Don't say nothing to nobody." The defendant agreed to meet the CHS at his apartment on Tuesday.

On April 4, 2017, the CHS asked the defendant how much he would charge him to remake the bomb. (Attach. Q.) The defendant clarified which type of bomb he wanted and indicated that he will give him one. (*Id*.) They outlined the plan for the defendant using a "device" and "car" to "send a bad message" but elaborated, "we don't want to kill anyone, just blow up the fricking car," using "C-4" or "TNT." The defendant explained how they did the same thing back at home in Iraq by kidnapping kids for ransom or blowing up a business to send a message. He then discussed with the CHS what he needed to construct the bomb including the explosive, types of wires, and other components. (*Id*.) The two discussed how much the defendant would charge the CHS and he initially said "you give me whatever" but later indicated that the CHS should charge "twenty four hundred, two thousand," the price of three grenades. (*Id*.) They then discussed the target, his mafia protection and bulletproof vehicle. (*Id*.)

Later the same day, the defendant told the CHS that he could make bombs that detonate when a book is opened or in a laptop and that his cousin does it every day. (Attach. Q.) An undercover employee (UCE) joined the defendant and CHS and they

discussed payment of $4500 for the device that would blow up the vehicle to send a message.  (*Id.*)  The defendant also indicated that he would travel to Las Vegas and use his brother's ID.  The defendant wanted to build and detonate a small test bomb in Tucson before the trip to Las Vegas, but the UCE pushed back on the idea.

On April 11, 2017, the defendant and CHS visited a possible new location for the defendant's shop.  (Attach. R.)  The defendant indicated that he could not travel to Las Vegas because of his probation but that he could make the device in Tucson to take out in the desert to detonate.  The defendant then showed the CHS some explosive materials/instructions on his cell phone and explained the instructions were in Arabic, not English, "because the FBI and CIA are looking at your language." (*Id*.)  He then described that they won't need C-4, that he can make the explosive with items from Home Depot and can cook the stuff at home in four or five hours.  (*Id.*)

On April 13, 2017, there was yet another discussion led by the defendant about various types of bombs and their construction.  (Attach. R.)  A UCE joined the conversation and the defendant had a lengthy conversation about the details of building the bomb and the reasons he wanted to use homemade explosive as opposed to TNT.  (*Id*.)

On April 13, 2017, the defendant met with the CHS at his apartment.  They spoke about making bombs and the defendant showed homemade bomb instructions to the CHS on his cell phone and promised to translate them into English.  Later, the defendant drew a diagram of the bomb on paper for the CHS.  The defendant showed the homemade bomb instructions to others on his cell phone and indicated, "I can get everything at Home Depot."  "I didn't make any of these."  "I've seen this stuff blow up people."  The defendant explained how he observed the homemade bucket bomb set up along a highway in Iraq and blow up vehicles.  The defendant admitted to making bombs in Iraq using different cell phones and insisted on making his homemade bomb recipe to avoid detection.  He also expressed concern that C-4 would be traced back to them and explained how lethal the C-4 bombs were back in Iraq.  When asked about alternative explosives, the defendant indicated he felt most confident in using TNT.  The defendant also described

how in Iraq they filled 40-ounce bottles with gas, inserted grenades and activated the bomb by pulling on fishing wire. The defendant then showed a video of people making homemade bombs, explained what was happening and further explained how to place the cell phone bomb/box next to the car before activating the bomb. After the defendant stated he had all the wiring, but needed to buy a phone, he was provided money to buy the phone. The defendant indicated that, "This is not just about the money. This is long-term."

On April 16, 2017, the defendant explained that he would need a 16-volt battery, not a 9-volt battery, to build the cell phone bomb. The defendant claimed that law enforcement would know if they used TNT or C-4, but not if they used a homemade bomb. The defendant also told the CHS how he was studying up on how to build an explosive and had spent all night reading about it. The defendant then sent the CHS a text message with a bomb recipe written in Arabic.

On April 19, 2017, the defendant and other individuals met to finalize the Las Vegas "bomb-making" operation. (Attach. S.) The defendant reiterated his need for a 16-volt versus 9-volt battery and that he thought using a car alarm powered by a motorcycle battery would detonate the bomb and they would be a safe distance away from the blast. The defendant was asked to provide a list of items to build the bomb that they would buy and bring to the house in Las Vegas. The defendant again insisted on making a small homemade bomb and setting it off at Lot 22 before they left for Las Vegas. The defendant and his brother both admitted to "shooting them" all the time at the shop. The defendant and his brother also described making a bomb that would be capable of killing others near the target in Las Vegas. The defendant agreed to provide the list of items for the bomb and said, "I know 100% this shit will happen. I am going to make a little one on video and show it to you."

Later that day, after talking about some of the Las Vegas trip details, the defendant said, "if we do this, we will be family." The defendant claimed, "I can make a bomb with a bottle of water" and proposed that he and the CHS could work together to send boxes of the bomb material to Mexico to make money. The defendant asked if the CHS could get

TNT to use for the car bomb to save the defendant the time of having to cook for his homemade recipe. The CHS confirmed with the defendant that the target of the bomb would be in a car or a house. The defendant said he would use gloves to avoid leaving fingerprints on the bomb.

On April 21, 2017, the defendant reported that he had been working on the car alarm to get it ready for the car bomb. He listed the items he needed for the bomb, including 2-3 feet of wire, 12-volt motorcycle battery, "lightning thing" (fuse from grenade), TNT, box, car alarm with control. The CHS and defendant discussed the need for safety when constructing the bomb and the CHS showed a photo of the target - the "Mexican Commandante" - to the defendant.

On April 24, 2017, the CHS and UCE met with the defendant and his brother at Lot 22. The defendant explained that he was still going to Las Vegas. However, his brother would not be joining them just in case something happened. The defendant indicated he would use his brother's ID to board the plane. He then insisted that the TNT for the bomb needed to be new, not old, so the DTO would not blame him if the bomb did not work.

On April 26, 2017, the defendant and others flew on an FBI contracted plane from Tucson to Las Vegas. Based on the defendant's list, the following items to build an electronically activated explosive device (device) were provided: TNT (C-4), fuses (blasting caps), 12-volt motorcycle battery, car alarm, wire cutters, gloves and a suitcase. The defendant brought the following items on his own: military style knife to cut wires, spool of white covered electrical tape, circuit tester and two tubes of Permatex Epoxy. Prior to constructing the device, the defendant insisted that all electronic devices in the condominium be deactivated; he unplugged a clock radio, turned his phone off and removed his watch. The defendant then instructed a UCE how to build the device. After he said a prayer, he requested that the UCE place the bag with the explosives (inert C-4) and fuses (inert blasting caps) on a couch away from then, and began constructing the device.

During the initial construction of the device, the defendant determined the car alarm that the UCE brought was too complicated to use. As a result, the defendant and others left the condominium and purchased an Avital 1-way keyless entry system to use in place of the car alarm. Upon their return to the condominium, the defendant continued to build the device while the UCE observed. He described what he was doing as he constructed the device. He also acknowledged the power of using C-4 and described how one stick of C-4 would be enough to lift a car and flip it over. At one point, the defendant sympathized with the retaliatory purpose behind building the device and said, "tribes killed my father; that's why I enjoy this shit…get this fucker." As he finished his construction of the device, the defendant acknowledged having sent the homemade bomb recipes to the CHS back in Tucson.

After the defendant built the device, he described how the wiring in the device functioned. He then showed the UCE how to connect the blasting caps and where to place the C-4. The CHS explained how the target would arrive in Las Vegas and likely be driving a rental car and the defendant described how much damage the device would cause to the car. The defendant offered to make a homemade recipe back in Tucson for more explosives to add to the device. The defendant guided the UCE as he made a second device. After both devices were made, the defendant explained to a UCE how the devices operated and the UCE gave forty $100 bills to him as payment for constructing and teaching the UCE how to build/operated the devices.[2] Later that evening at dinner, the

---

[2] The FBI Laboratory in Quantico, Virginia, examined the recipes with instructions the defendant provided to the CHS as well as the devices he constructed in Las Vegas. Regarding the recipes, the examiner opined that, if properly assembled, the devices are capable of causing property damage, personal injury and/or death. Regarding the Vegas devices, the examiner opined that the manner in which the fusing systems were constructed "would not have reliably initiated a commercially manufactured electric detonator" because the fusing system would not have provided the sufficient current necessary to trigger detonation.

defendant told the CHS that he almost cancelled the trip to Las Vegas had it not been for his friendship with the CHS.

After the defendant and others constructed the devices on April 26, 2017, everyone went to dinner and then to the lounge area of the New York New York hotel. That evening, there was discussion about a Russian mobster in Miami, Florida wanting to obtain a laptop computer bomb. There was interest in purchasing the blueprints for such a bomb from the defendant's cousin.

Over the next few weeks, there were numerous discussions between the defendant and others about building a laptop bomb. On May 20, 2017, the defendant met with the CHS where they briefly discussed going to Miami to build the laptop computer bomb. During that conversation, the defendant indicated he wanted to work for the DTO full-time and was willing to travel to Miami.

On other dates, the defendant described how the wiring and connections inside the laptop operated and how to activate the explosive. The defendant said he could get the plans for the laptop bomb from his cousin and would have his lady/wife translate them from Arabic into English. On June 3, 2017, the defendant provided a brief overview of how the laptop bomb would work and was told he would be paid $1500-2000 for his services and then double the money if the plan was successful. (Attach. T.)

On June 3, 2017, the defendant and CHS spoke via telephone. During the conversation, the defendant stated that if the laptop bomb he was going to build was successful in killing the "snitch" they wanted to kill, the DTO would owe him (Ahmad Ahmad) $10,000. The defendant also assured the CHS that the bomb he was going to build would work and would kill the informant.

On June 7, 2017, the defendant demonstrated how to build a laptop bomb. The defendant brought a backpack filled with an assortment of tools and batteries along with his own laptop (Lenovo). At the beginning of the meeting, a UCE told the defendant that the Russians called him to Europe because someone in their organization was going to snitch. The UCE further explained how the snitch was in New York and preparing to

travel by train to Miami. According to the UCE, the plan was to sneak a laptop into the hotel room where the snitch was staying.

Initially, the defendant showed the inside components of his phone and explained how he was trying to learn all of the components and wiring. The defendant began taking his laptop apart, pointed to the wiring inside and described how to use C-4 and blasting caps to build a laptop bomb. The defendant said he learned how to build the laptop bomb after he spoke to his cousin in Iraq on FaceTime. The defendant then meticulously broke down his laptop and removed the inside panel. He explained which parts of the laptop were needed to construct the bomb, and where to place the wires and battery to activate the switch and ignition. The defendant offered to travel to Miami to perform the soldering task. The defendant forecasted, "He'll open laptop, he'll sit down and press button and want to see what's up with laptop…can't find his face anymore." The defendant ultimately agreed to travel to Miami to build the laptop bomb.

On June 27, 2017, the CHS conducted another heroin purchase from the defendant. The CHS provided the defendant $1800 to purchase heroin from his junkyard neighbor. The defendant was arrested later that day by PCSO after heroin and methamphetamine was found in his vehicle. Following his arrest by PCSO, the defendant entered a guilty plea to Solicitation to Transport a Narcotic Drug for Sale, a Class Four Felony, in violation of A.R.S. §§ 13-1002 and 13-3408; he was sentenced to a term of two years' imprisonment.

On October 26, 2018, the defendant was arrested by agents with the FBI on a federal complaint charging Distribution of Information Relating to Explosives, Destructive Devices and Weapons of Mass Destruction in violation of 18 U.S.C. § 842(p)(2)(B).

On November 20, 2018, the defendant was indicted on two counts of Distribution of Information Relating to Explosives, Devices and Weapons of Mass Destruction in violation of 18 U.S.C. § 842(p)(2)(A), one count of Conspiracy to Possess with Intent to Distribute Heroin in violation of 21 U.S.C. § 846, and one count of Possession with Intent

to Distribute Heroin; Aiding and Abetting in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(C).

On June 12, 2020, the defendant filed a motion to dismiss the indictment, with claims that the government's investigative conduct was outrageous and violated the defendant's Fifth and Sixth Amendment rights under the United States Constitution. (ECF Doc. 105.) The defendant's motion should be denied.

## II.     LAW AND ANALYSIS

Outrageous government conduct occurs when the actions of law enforcement officers or informants are "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). This claim requires meeting a high standard, with a showing that "the government's conduct violates fundamental fairness and is 'shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment.' " *United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003) (quoting *Russell*, 411 U.S. at 431–32, 93 S.Ct. 1637). The Ninth Circuit explained in *Gurolla* that "[t]his standard is met when the government engineers and directs a criminal enterprise from start to finish," but "is not met when the government merely infiltrates an existing organization, approaches persons it believes to be already engaged in or planning to participate in the conspiracy, or provides valuable and necessary items to the venture." *Id.* (internal quotation marks and citations omitted). Outrageous government conduct is not a question of fact for the jury, but a question of law for the Court. *United States v. Citro*, 842 F.2d 1149, 1152 (9th Cir. 1988.)

There is no bright line dictating when law enforcement conduct crosses the line between acceptable and outrageous, so "every case must be resolved on its own particular facts." *United States v. Bogart*, 783 F.2d 1428, 1438 (9th Cir. 1986), vacated in part on other grounds sub nom. *United States v. Wingender*, 790 F.2d 802 (9th Cir.1986) (order). In assessing the reasonableness of various law enforcement actions and tactics, however, the Ninth Circuit has set forth ground rules that provide some guidance. For example, it is

outrageous for government agents to "engineer[ ] and direct[ ] a criminal enterprise from start to finish," *United States v. Williams*, 547 F.3d 1187, 1199 (9th Cir. 2008) (internal quotation marks omitted), or for the government to use "excessive physical or mental coercion" to convince an individual to commit a crime, *United States v. McClelland*, 72 F.3d 717, 721 (9th Cir.1995). It is also outrageous for the government to "generat[e] ... new crimes merely for the sake of pressing criminal charges." *United States v. Emmert*, 829 F.2d 805, 812 (9th Cir.1987). It is not outrageous, however, to infiltrate a criminal organization, to approach individuals who are already involved in or contemplating a criminal act, or to provide necessary items to a conspiracy. *See United States v. So*, 755 F.2d 1350, 1353 (9th Cir.1985). Nor is it outrageous for the government to "use 'artifice and stratagem to ferret out criminal activity.' " *Bogart*, 783 F.2d at 1438 (quoting *Sorrells v. United States*, 287 U.S. 435, 441, 53 S.Ct. 210, 77 L.Ed. 413 (1932)).

Dismissing an indictment for outrageous government conduct, however, is "limited to extreme cases" in which the defendant can demonstrate that the government's conduct "violates fundamental fairness" and is "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011) (internal quotation marks omitted). This is an "extremely high standard." *United States v. Garza–Juarez*, 992 F.2d 896, 904 (9th Cir.1993) (quoting *United States v. Smith*, 924 F.2d 889, 897 (9th Cir.1991)) (internal quotation marks omitted). Indeed, there are only two reported decisions in which federal appellate courts have reversed convictions under this doctrine. *See United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978); *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971); s*ee also State v. Lively*, 130 Wash.2d 1, 921 P.2d 1035 (1996) (reversing drug conviction under state law, but relying on federal cases in finding outrageous government conduct).

In *United States v. Black*, 733 F.3d 294 (9th Cir. 2013), the Ninth Circuit identified six factors "as relevant to whether the government's conduct was outrageous": (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's

encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue. *Id.* at 303. The Ninth Circuit noted that "the first three are most relevant to the way in which the government set up the sting," while "the fourth and fifth look to the propriety of the government's ongoing role in the sting," and the last focuses on the justification for the operation. *Id.* at 303–04.

There is no doubt that the government conduct in this case was far from "outrageous." In fact, the conduct at issue in this case was simply a standard undercover operation to gather evidence, and did not even come close to that which would "shock the conscious" and establish a Due Process violation. The government was not arbitrarily looking for individuals who were willing to build bombs; rather, law enforcement acted in response to statements made by a source of information who approached the government with information. That information, that the defendant was making and selling pipe bombs at his place of business, warranted further investigation and created an individualized suspicion of the defendant. Following up on tips from sources of information is basic investigative work.

Over the course of the FBI's investigation, the FBI inserted multiple CHS and UCE personnel to uncover the criminal activities that the defendant was conducting at Lot 22. As outlined above, in November 2016, the FBI's CHS assets began meeting with the defendant at Lot 22. The entire undercover investigation concluded in June 2017. Over that short seven-month span of time, the FBI exposed how the defendant was more than willing to assist what he thought was a group of drug smugglers engage in criminal activity involving drugs, guns and explosives. From incredibly early in the defendant's friendship with the main CHS, the defendant freely discussed his access to, and interest in, drugs, weapons and explosives as well as his experiences with homemade bombs in Iraq. While the defendant might now regret the bold statements he made at these meetings, "the

government was entitled to rely on the defendants' representations of their past criminal conduct." *Black*, 733 F.3d at 307 n.10.

As outlined above, the defendant repeatedly initiated attempts to sell various types of drugs to the CHS. On November 16, 2016, the defendant tried to sell the CHS methamphetamine. On December 7, 2016, the defendant tried to sell cocaine to the CHS. On January 2, 2017, the defendant tried to buy cocaine from the CHS. At the end of the month, on January 30, the defendant attempted to sell the CHS heroin that his friend was selling. Whether the defendant was a middleman, courier or drug kingpin, the defendant instigated the drug transactions, not the government. The defendant took every opportunity to sell drugs, anything he could get his hands on. The defendant's offer to engage in criminal activity justified further investigation by the government.

Although the defendant takes issue with the CHS not asking specifically for the defendant to build a pipe bomb, it was the defendant who initially discussed how "easy" it was to build bombs, the defendant who started a conversation about observing cell phone bombs on the back of donkeys in Iraq and the defendant who indicated his willingness to travel to Mexico to help the CHS construct a bomb. Once the CHS told the defendant about a specific target, the defendant obtained various recipes for bombs, provided those to the CHS and engaged in numerous discussions about the bomb construction with both the CHS and UCE. Thus, the defendant was a willing and eager participant. As he expressed at the May 20, 2017 meeting with the CHS, he wanted to start working for the DTO full-time and his involvement in the offenses was "…not just about the money. This is long term."

Further, the actions of the defendant expanded the scope of the investigation as his attempts to ingratiate himself with the DTO continued. During his conversations with the CHS and UCEs, the defendant brought up building a bomb using a book or a laptop computer, without any prompting from the government. The government merely responded to the defendant's proposed new criminal conduct. In fact, throughout the investigation, the CHS and UCEs repeatedly sought to deter the defendant from building

and detonating devices in the desert as well as cooking the explosive material to transport to Las Vegas. The defendant presented himself as having knowledge and expertise in building explosives for a profit and the government presented him with the opportunity to demonstrate those skills.

The defendant does not claim that he was physically coerced or abused by agents or informants. Nor does he claim that the undercover efforts were inappropriate, given the nature of the crime being pursued and necessity for actions taken in light of the criminal enterprise. Although the defendant claims that the government had violated due process because a government informant exploited his relationship with the defendant, "the 'illusory cultivation of emotional intimacy' does not exceed due process limits." *United States v. Simpson*, 813 F.2d 1462, 1467 (9th Cir. 1987). The defendant's general attack on undercover operations is insufficient to support an outrageous government misconduct claim.

In his motion, the defendant compares his case to *United States v. Lard*, 734 F.2d 1290 (8th Cir. 1984), arguing that the facts of his case are comparable to those in the *Lard* case. In *Lard*, the defendant was charged with providing a destructive device (a pipe bomb) to undercover agents. The agents not only approached the defendant and asked him for the bomb, but when the defendant hesitated and attempted to sell the agents a small (and legal) detonator, the agents persisted until the defendant agreed to make them a pipe bomb and sell it to them. 734 F.2d at 1292. These are not the facts here, as outlined above. Further, the *Lard* court noted only that this "approached" being outrageous enough to warrant dismissal, *Id*. at 1296.


/// /// ///


/// /// ///

### III. CONCLUSION

Contrary to the defendant's assertions, there was no outrageous government conduct requiring dismissal, nor is dismissal appropriate where the target enthusiastically embraces his criminal activity in repeated recorded conversations. Due process is not offended by the government's reliance on a target's own statements and conduct when assessing his proclivity to criminal behavior. Wherefore, the United States respectfully requests that this Court deny the defendant's motion to dismiss.

RESPECTFULLY SUBMITTED on this 9th day of July 2020.

MICHAEL BAILEY
United States Attorney
District of Arizona

*s/ Erica L. Seger*

Erica L. Seger
Assistant United States Attorney

Copy of the foregoing served electronically or by
other means this 9th day of July, 2020, to:

All ECF participants

EXHIBITS "A through T" to the

Government's Response to Defendant's Motion to

Dismiss for Outrageous Government Conduct

*U.S. v. Ahmad Suhad Ahmad*

CR 18-02417-TUC-RCC

# UNDER SEAL