JON M. SANDS
Federal Public Defender
**WALTER I. GONÇALVES, JR.**
Assistant Federal Public Defender
State Bar No. 023659
407 W. Congress St., Suite 501
Tucson, AZ 85701
Telephone: (520) 879-7500
*walter_goncalves@fd.org*
Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR18-02417-TUC-RCC (LCK) |
| Plaintiff, | |
| vs. | **SENTENCING MEMORANDUM** |
| Ahmad Suhad Ahmad, | |
| Defendant. | |

## I.     Introduction

Ahmad Suhad Ahmad will appear before this Court for sentencing on December 15, 2020. By that date he will have served 781 days of pre-trial incarceration, or 25 months and 19 days. The Court should impose a sentence of time served. This sentence fulfills the goals of federal sentencing. 18 U.S.C. § 3553(a). As explained in Defendant's Objections to Pre-Sentence Investigation Report (Doc. 137), the correct sentencing range is 21 to 27 months, or offense level 15 after reductions for acceptance of responsibility. (*See* Plea Agreement, Doc. 136, ¶ 11).

## II.     A Sentence of no More than 25 Months and 19 days (Time Served) Imprisonment is Enough but no Greater than Necessary to Meet the Purposes of Federal Sentencing

*A. The History and Characteristics of the Defendant*

Mr. Ahmad was born in Baghdad, Iraq on April 28, 1988. He, his mother, sister,

and twin brother emigrated to the United States when he was 17 years old. His older sister, Fafa Ahmad, remained in Iraq. Previously, the family moved to Syria after the death of his father to cancer, in 2004. The Iraq War also contributed to the family's decision to move. Mr. Ahmad saw people shot and killed. He even carried a dead body from a street in Baghdad. The situation in Syria was also precarious, so Sabiha Kareem, Mr. Ahmad's mother, applied for refugee status and members of the family received papers to come to the United States. They arrived in Tucson in 2008, when Mr. Ahmad was 20 years old.

Mr. Ahmad stopped attending school at age 12 to help his father as a mechanic. He did not return to school in Syria but worked selling sunflower seeds and cigarettes to help support the family. In Tucson, Mr. Ahmad attended Rincon High School for a period but did not finish because, once again, of the need to financially help family. He attended Pima County Community College for a brief period to study mechanics and became a naturalized citizen of the United States on December 13, 2013.

In 2010 Mr. Ahmad became a father to Kareem and Kiara (8 and 9 years old) after surgery on his left kidney (in 2012 doctors removed a cancerous tumor on his right hip). By this time, he was married to Danielle Mary Davis, African American. The couple separated in 2014 and the court ordered Mr. Ahmad to pay child support. In 2015 Mr. Ahmad began a relationship with Ghufran Al-Musawi. He helped her raise a daughter from a previous relationship. Ms. Al-Musawi gave birth to Mr. Ahmad's youngest child, Suhad, in 2016.

Unfortunately, addiction to methamphetamine and alcohol and abuse of other substances have plagued years of Mr. Ahmad's life in the United States. The methamphetamine allowed him to work long hours as a mechanic but afflicted his personal and family life. These addictions played a significant role in Mr. Ahmad's conduct and statements in this and other offenses. Not surprisingly, his prior conviction from 2016 is to simple possession of methamphetamine.

Although incarceration starting in June of 2017 sobered him, Mr. Ahmad's true test will come when the criminal justice system releases him from custody to supervised release. The sooner he can establish a healthy pattern of daily living, the quicker his

rehabilitation into a positive member of society.

The Arizona Department of Corrections (ADOC) released him from custody on September of 2018, one month before his arrest by the FBI for this case. During that month, Mr. Ahmad continued a process he began while at ADOC. Mr. Ahmad had a religious awakening while in custody. He woke up at 5 A.M. every day to pray. He also attended Mosque services every Friday. He obtained employment as a mechanic within two days of release from ADOC. Mr. Ahmad conducted himself well in prison and obtained advance release. They also moved him to a low-level camp in Marana.

### B. The Nature and Circumstances of the Offense

#### 1. Heroin[1]

The only drugs possessed by Mr. Ahmad in this case is in the custody of the FBI. On February 27, 2017 Mr. Ahmad acted as a middleman in the sale of 45.3 grams of heroin. Someone who rented a mechanic lot adjacent to him supplied the drugs. This individual claimed to receive heroin from a young woman who transported it across the U.S.-Mexico border as body carrier. The informant paid $1,600.00 but Ahmad made no more than $300.00 from the transaction. Count 1 of the indictment charges Mr. Ahmad with a conspiracy to sell heroin. The government agreed to dismiss this count at sentencing. It alleges Mr. Ahmad planned to sell 100 grams of heroin to the confidential informant. Although the sale never materialized, the government charged Mr. Ahmad with conspiracy.

#### 2. Providing recipes for building explosive devices

According to an application for a search warrant on page 1411 of disclosure, Mr. Ahmad told a confidential informant he knew how to detonate a bomb by using a cellular phone with a removable battery. As explained in previous pleadings, Mr. Ahmad only said

---

[1] The Probation Department references marijuana, cocaine, and other heroin amounts in the Draft Pre-Sentence Report. Defense counsel scrutinizes these allegations in Defendant's Objection to the Pre-Sentence Investigation Report (Doc. 137).

3

this to curry favor with the informant to leverage financial compensation. Mr. Ahmad knew he would fool them as much as he could to get paid. The device built in Las Vegas and the laptop, subject of counts 3 and 4, were not viable explosive devices.

Mr. Ahmad found the recipes he sent to undercover agents or confidential informants by using Google. Mr. Ahmad did not know the recipes, if followed, would lead to a viable explosive device. Although Mr. Ahmad travelled to Las Vegas, he only agreed to do so after repeated request over the period of weeks. He also consumed ample amounts of alcohol and methamphetamine during all his contact with the confidential informants and undercover agents. They supplied much of the alcohol. The period of the investigations and charges span a period in his active addiction to methamphetamine and alcohol.

*C. Seriousness of the Offense, Respect for the Law, and Just Punishment*

This section of 3553(a)(2)(A) requires consideration only of the defendant's past actions, not his probable future conduct nor the effect that the punishment might have on crime rates or otherwise. *See* Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005) (emphasis supplied). It requires the court to consider retribution, or an examination of the actor's blameworthiness for his past actions. *Id.*

The court must consider the nature and seriousness of the harm caused or threatened by the crime, the offender's culpability, intent, motives, role in the offense, and mental illness or diminished capacity. *See* Amy Baron Evans et al., Federal Defenders of San Diego, Inc., Defending a Federal Criminal Case, 17-775, 17-804 (2010). Other factors that decrease the seriousness of the offense include if physical and environmental factors diminished his knowledge or intent; if the offense resulted from a disadvantaged upbringing; abuse, poverty, addiction, mental illness; if the defendant's gain from the offense was minor; or if he paid restitution. *Id.*

Mr. Ahmad sold 45.3 grams of heroin and boasted of drug trafficking involvement

such as allowing others to use his rented mechanic shop for a marijuana transfer and a sale of heroin. He also allowed undercover persons to use the property for a weapons transfer. Although he sent viable bomb recipes to the undercover agents and confidential informants, he said many things to bolster his image to get paid. If there is truth to what confidential informants said about Mr. Ahmad is that he was a "wannabe gangster," documented on page 1336 of disclosure. But Mr. Ahmad was nothing more than a methamphetamine addicted mechanic who used his Middle Eastern background to trick people into thinking he could build bombs. He also lied about his status as drug dealer.

There is no question Mr. Ahmad would not have continued with his lies to confidential informants and undercover government agents if he was not using methamphetamine, alcohol, marijuana, and other substances daily. He needed the money offered to build the bomb to continue to fund his habits but also to help his family. Although he made money as mechanic, distractions from substance abuse got in the way.

### D. Deterrence and Protection of the Public
####  i. General Deterrence

Empirical research shows no relationship between sentence length and deterrence. *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28 (2006) and Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999). Potential criminals are not aware of penalties for their prospective crimes, do not believe authorities will apprehended and convict them, and simply do not consider sentence consequences in the manner one might expect of rational decision makers. *Id.* "There is generally no significant association between perceptions of punishment levels and actual levels . . . implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms." *See* Gary Kleck et al, *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005).

####  ii. Specific Deterrence

Section 3553(a)(2)(C) requires the judge to consider "the need for the sentence imposed . . . to protect the public from further crimes of the defendant." This purpose concerns both the defendant's risk of recidivism and the danger posed by the defendant, if any. It "is particularly important for those offenders whose criminal histories show repeated serious violations of the law." S. Rep. No. 98-225 at 76 (1983). It is not so important for first offenders, for those with negligible risk of recidivism, for those whose prior offenses are minor or non-violent, or for those who have a strong potential for rehabilitation, through treatment they have never received.

Mr. Ahmad needs drug treatment, which he can obtain out-of-custody. The Bureau of Prisons RDAP program is available, but only if a sentence requires years of incarceration. Mr. Ahmad would have to qualify for the program, but it requires one year to complete. He will not qualify if his sentence requires less than one-year incarceration. Mr. Ahmad could relapse on methamphetamine, alcohol, or other drugs; however, the court should not impose a sentence of more than time served. Mr. Ahmad poses no risk to commit drug crimes involving possession for distribution. Instead, a period of supervised release is appropriate. He also poses no risk to distribute bomb recipes. His incarceration has been very difficult, and he does not wish to return to confinement.

The Court must know that his prior conviction for CR20173080 resulted from a traffic stop where a Pima County Sheriff Deputy found 49.08 grams of heroin in Mr. Ahmad's car. The irony is that the FBI orchestrated this arrest yet did not arrest him for any federal crimes until October 26, 2018. Page 1384 of disclosure explains that the FBI made "Operational Plans for a buy bust with PCSD" on June 27, 2017, his last day of freedom until his release from ADOC in 2018, one month before the start of this case.

The U.S. government did not file a writ for him in ADOC. They waited for one month to arrest him after his release from ADOC, as he arrived from Phoenix to visit his children. The arrest took place at the parking lot of the apartment complex where he and Ms. Al-Musawi lived with their son and her daughter. All crimes for the instant case took place before Pima County Superior Court convicted him on CR20173080. If the Court

imposes time served, he will have served three years and four months in custody total.[2]

Mr. Ahmad constructed explosive devices that did not work to make a profit from the undercover agents and confidential informants, but he sent them recipes he did not know were viable. Mr. Ahmad assumed the risk the recipes would work. But his incarceration so far is enough retribution, especially considering the fact it falls within the correct guideline range of 21 to 27 months and he has been in custody for longer.

*E. Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner*

Section 3553(a)(2)(D) requires the court to consider "the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." There is evidence that prison, by disrupting employment, reducing prospects of future employment, weakening family ties, and exposing less serious offenders to more serious offenders, leads to increased recidivism. *See* Lynne M. Vieraitis, Tomaslav V. Kovandzic, 55 Thomas B. Marvel, *The Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002*, 6 Criminology & Public Policy 589 (2007); USSC, Staff Discussion Paper at 18-19, Sentencing Options under the Guidelines (Nov. 1996).

Mr. Ahmad should not serve more time in custody. His three children speak with him over the telephone periodically as does his mother, sister, and brother. More time in custody will only worsen the connection he has established through telephone communication.

**III. Conclusion**

For all reasons explained, the Court should impose a sentence of time served.

---

[2] According to ADOC records, the ADOC released him on September 28, 2018. He had been in custody since June 27, 2017. Government agents arrested him for this case on October 26, 2018.

RESPECTFULLY SUBMITTED this 8th day of December 2020.

JON M. SANDS
Federal Public Defender

*/s/ Walter I. Gonçalves, Jr.*
WALTER I. GONÇALVES, JR.
Assistant Federal Public Defender

Copy of the foregoing has been provided

by electronic transmittal via the CM/ECF System:

Erica Seger
Assistant United States Attorney

Jaime Muse
United States Probation Officer